Joanne K. CORRADO and Joseph A. Corrado, Appellees,

v.

THOMAS JEFFERSON UNIVERSITY HOSPITAL, et al. Appellant,

and

Herbert E. Cohn, M.D. and Giancarlo Barolat, M.D. and Jerome M. Cotler, M.D. and John R. Cohn, M.D., Appellees,

Joseph A. Corrado, Administrator of the Estate of Joann K. Corrado, Deceased in His Own Right, Appellee,

v.

Thomas Jefferson University Hospital, et al. Appellant,

and

Herbert E. Cohn, M.D. and Giancarlo Barolat, M.D. and Jerome M. Cotler, M.D. and John R. Cohn, M.D., Appellees.

Joanne K. Corrado and Joseph A. Corrado, H/W Appellants,

v.

Thomas Jefferson University Hospital, et al. Appellee,

and

Herbert E. Cohn, M.D. and Giancarlo Barolat, M.D. and Jerome M. Cotler, M.D. and John R. Cohn, M.D., Appellees.

Joseph A. Corrado, Administrator of the Estate of Joann K. Corrado, Deceased in His Own Right, Appellants,

v.

Thomas Jefferson University Hospital, et al. Appellees,

and

Herbert E. Cohn, M.D. and Giancarlo Barolat, M.D. and Jerome M. Cotler, M.D. and John R. Cohn, M.D., Appel-lees.

Superior Court of Pennsylvania.

Argued May 22, 2001.

Filed Dec. 19, 2001.

Reargument Denied March 1, 2002.

**1026**

Barbara Magen, Philadelphia, for Thomas Jefferson University Hospital and Cohn.

Richard R. Galli, Philadelphia, for Cohn appellee.

Anthony M. DiMassa, Philadelphia, for Corrado, appellee.

Before FORD ELLIOTT, BROSKY and BECK, JJ.

BECK, J.:

¶ 1 This is an appeal and cross-appeal from an order which granted in part and denied in part appellant Joseph A. Corrado's motion for post-trial relief. In its order the trial court granted a new trial as to appellee/cross-appellant Thomas Jefferson University Hospital (the "Hospital"), and denied a new trial and a request to remove non-suit made by Corrado as to appellees Herbert E. Cohn, M.D. and John R. Cohn, M.D. For the reasons that follow, we affirm.

—Facts and Procedure—

¶ 2 In this medical malpractice case Corrado alleged that the appellee doctors failed to timely diagnose his wife Joanne K. Corrado's recurrence of lung cancer. Mrs. Corrado was initially diagnosed with lung cancer in April 1992. At that time she was scheduled by Dr. Giancarlo Barolat for a cervical fusion when he detected a problem with her chest x-ray. She was referred to Dr. John Cohn, a pulmonologist who referred her to Dr. Herbert Cohn, a thoracic surgeon, for surgery. Following a lung lobectomy in May of 1992, Mrs. Corrado continued her follow-up care with Dr. John Cohn and Dr. Herbert Cohn. For the next two years Mrs. Corrado suffered from a persistent cough. Numerous diagnostic tests were performed on Mrs. Corrado to detect the presence of cancer. However, according to her treating physicians, the tests were negative. In particular, in May 1993, a CT scan was performed on Mrs. Corrado at Thomas Jefferson University Hospital. The CT scan was interpreted by Dr. Alfred Kurtz, a Hospital radiologist. Dr. Kurtz's report indicated no cancer cells were present. In September 1993, Dr. Barolat and Dr. Joseph M. Cotler performed a cervical fusion on Mrs. Corrado. Subsequently, malignant cells were detected during a bronchoscopy performed by Dr. John Cohn in April 1994. Soon thereafter Mrs. Corrado sought a second opinion from Dr. Luther Brady. Dr. Brady reviewed the results of Mrs. Corrado's past diagnostic tests, and concluded that the May 1993 CT scan showed a recurrence of cancer.

¶ 3 Mrs. Corrado filed this medical malpractice action in April 1996. After Mrs. Corrado died on September 4, 1996, a wrongful death/survival action followed. The case proceeded to trial on September 10, 1999. Dr. Barolat and Dr. Cotler were dismissed by stipulation of the parties at the outset of trial. At trial Corrado presented documentary evidence and the testimony of several witnesses including Robert DeJager, M.D. and Luther Brady, M.D., as well as John Cohn, M.D. and Herbert Cohn, M.D., on cross-examination. Following Corrado's case in chief, each of the appellees motioned for compulsory non-suit. The trial court granted each appellees' motion for non-suit. Corrado filed a motion for post-trial relief, requesting the court to remove the non-suits and grant a new trial because of alleged errors. The trial court issued an order dated March 31, 2000, granting Corrado a new trial as to the Hospital. However, the trial court denied Corrado's request for a new trial and removal of the non-suit as to appellees Dr. Herbert Cohn and Dr. John

Cohn. The Hospital filed an appeal. Corrado also appealed the trial court's order.

—New Trial Against Hospital—

¶ 4 We will first address the issues raised by the Hospital. The Hospital maintains the trial court erred in removing a non-suit and granting a new trial against it. Preliminarily, we note that a trial court has broad discretion to grant or deny new a trial. *Harman v. Borah*, 562 Pa. 455, 465, 756 A.2d 1116, 1121–1122 (2000). Absent a clear abuse of discretion by the trial court, appellate courts must not interfere with a court's authority to grant or deny a new trial. *Id.*

¶ 5 The Hospital first argues the requisite expert evidence against it was lacking. At trial, Corrado's theory of liability against the Hospital was based upon the alleged negligence of its agent, radiologist Dr. Kurtz, who read and prepared a report of the CT scan of the decedent taken in May of 1993. At trial, Corrado offered the testimony of Dr. Robert DeJager, who was asked if he had an opinion based upon his review of the decedent's medical records whether the Hospital's radiologist who read the May 1993 CT scan films deviated from the acceptable standard of medical care. Counsel for the Hospital and Dr. John Cohn objected on the basis of Dr. DeJager's lack of qualifications to testify regarding the standard of care of radiologists. The trial court sustained the objection, finding that because Corrado only qualified Dr. DeJager in the areas of internal medicine and oncology, plaintiff's expert was unqualified to testify about the standard of care in radiology. As a result of the absence of any expert testimony from Corrado on the issue of the liability of the Hospital, the trial court entered non-suit in favor of the Hospital. Upon reviewing Corrado's post-trial motions the trial court determined that it had erred in precluding Dr. DeJager from testifying regarding the standard of care of radiologists. Therefore, the trial court granted a new trial as to the Hospital.

¶ 6 On appeal, the Hospital submits that Corrado was not entitled to a new trial on this issue. The Hospital maintains that Dr. DeJager had no qualifications on the issue of reading and interpreting CT scans or the standard of care concerning radiologists. We disagree.

[I]t is well established in this Commonwealth that the standard for qualification of an expert witness is a liberal one. The test to be applied when qualifying an expert witness is whether the witness has any reasonable pretension to specialized knowledge on the subject under investigation. If he does, he may testify and the weight to be given to such testimony is for the trier of fact to determine.

*McClain v. Welker*, 761 A.2d 155, 156–57 (Pa.Super.2000)(citing *Miller v. Brass Rail Tavern*, 541 Pa. 474, 664 A.2d 525, 528 (1995)). In the area of medicine, specialties sometimes overlap and a practitioner may be knowledgeable in more than one field. *Bindschusz v. Phillips*, 771 A.2d 803, 809 (Pa.Super.2001). While different doctors will have different qualifications and some doctors are more qualified than others to testify about certain medical practices, it is for the jury to determine the weight to be given to expert testimony in light of the qualifications shown by the expert witness. *Montgomery v. South Philadelphia Medical Group, Inc.*, 441 Pa.Super. 146, 656 A.2d 1385, 1388–1389 (1995). Whether a witness has been properly qualified to give expert witness testimony is vested in the discretion of the trial court. *West Philadelphia Therapy Center v. Erie Insurance Group*, 751 A.2d 1166, 1168 (Pa.Super.2000).

¶ 7 Dr. DeJager testified that he specialized in internal medicine and medical oncology, and was board certified in those areas. Dr. DeJager further noted that he received training in reading radiology films and CT films as part of his residency and fellowship training. Moreover, he testified that his work involved the multidisciplinary approach in the diagnosis of cancer cases in university hospitals which required consultation between specialties. The Hospital's contention that Dr. DeJager was not qualified because he is not a radiologist is unavailing because experts in one area of medicine may be found qualified to address other areas of specialization where the specialties overlap in practice or where the specialist has had experience in a related field of medicine. *See, e.g., Rittenhouse v. Hanks,* 777 A.2d 1113, 2001 PA Super 153 (finding that urologist was qualified to testify on subject matter of radiation oncologist where his practice involves diagnosis and treatment of prostrate cancer); *Lira v. Albert Einstein Medical Center,* 384 Pa.Super. 503, 559 A.2d 550 (1989) (finding that neurologist with some training in otolaryngology competent to render expert testimony on conduct of otolaryngologist).

¶ 8 We find the trial court was correct in determining that Dr. DeJager should have been qualified as an expert because his experience logically embraces the matter at issue. Thus, we find the decision of the trial court to grant a new trial because it had failed to qualify Dr. DeJager as an expert during trial did not constitute an error of law or an abuse of discretion. Without Dr. DeJager's testimony, Corrado could not establish the causation element of his *prima facie* case against the Hospital. Therefore, the trial court correctly removed the non-suit.

¶ 9 The Hospital next argues that even if Dr. DeJager was qualified to provide expert testimony as to the standard of care applicable to radiologists, a new trial is unwarranted because Dr. DeJager's expert report does not mention an alleged deviation from the standard of care with respect to an interpretation of the CT scan. The Hospital submits that if Dr. DeJager rendered an opinion on whether Dr. Kurtz deviated from the standard of care, such testimony would fall outside the scope of Dr. DeJager's expert report and would be inadmissible under Pa.R.Civ.P. 4003.5(c).

¶ 10 Where the trial court has specifically enumerated the reasons on which it based its grant of a new trial, this Court can only examine those stated reasons to determine whether they may be supported by the record. *Coker v. S.M. Flickinger Co.,* 533 Pa. 441, 625 A.2d 1181 (1993). Since in this case the trial court specified only one reason for granting a new trial to the Hospital, i.e., that Dr. DeJager was improperly disqualified from testifying as an expert, we can only examine the merits of that reason.

¶ 11 Even if we addressed the Hospital's argument that Dr. DeJager's testimony falls outside of his report, we find the argument without merit. Rule 4003.5(c) of the Pennsylvania Rules of Civil Procedure specifically states:

To the extent that the facts known or opinions held by an expert have been developed in discovery proceedings under ... this rule, the direct testimony of the expert at trial may not be inconsistent with or go beyond the fair scope of his or her testimony in the discovery proceedings as set forth in his deposition, answer to an interrogatory, separate report, or supplement thereto. However, the expert shall not be prevented from testifying as to facts or opinions on matters on which the expert has not been interrogated in the discovery proceedings.

Pa.R.Civ.P. No. 4003.5(c). The Rule's Explanatory Note states that "where the full scope of the expert's testimony is presented in ... the separate report ... this will fix the permissible limits of his testimony at trial." This limitation "serves to insure that an expert's report will be sufficiently comprehensive and detailed to inform an opposing party of the expert's testimony at trial." *Havasy v. Resnick,* 415 Pa.Super. 480, 609 A.2d 1326, 1331 (1992). When applying the "fair scope" rule, our court has held that:

> In deciding whether an expert's trial testimony is within the fair scope of his report, the accent is on the word "fair[.]" The question to be answered is whether, under the particular facts and circumstances of the case, the discrepancy between the expert's pre-trial report and his trial testimony is of a nature which would prevent the adversary from preparing a meaningful response, or which would mislead the adversary as to the nature of the response.

*Brady v. Ballay, Thornton, Maloney, Maloney Med.,* 704 A.2d 1076, 1079 (Pa.Super.1997)(quoting *Jones v. Constantino,* 429 Pa.Super. 73, 631 A.2d 1289, 1294–95 (1993)).

¶ 12 The purpose of requiring a party to disclose, at his adversary's request, "the substance of the facts and opinions to which the expert is expected to testify" is to avoid unfair surprise by enabling the adversary to prepare a response to the expert testimony. *Walsh v. Kubiak,* 443 Pa.Super. 284, 661 A.2d 416 (1995). The question is whether the discrepancy between the expert's pretrial report and his trial testimony is of a nature which would prevent the adversary from preparing a meaningful response, or which would mislead the adversary as to the nature of the appropriate response. *Id.*

¶ 13 Here, the pre-trial report of Dr. DeJager stated that the CT scan performed on 5/3/93 was incorrectly interpreted as showing no signs of intrathoracic recurrence of tumor. The report further provided that metastatic disease documented on CT scans went undetected by radiologists and attending physicians from 5/93 until 3/94. The report went on to state that the "delay in recognizing and treating metastatic lung cancer with chemotherapy more likely than not had an adverse effect on [the decedent's] quality of life by failing to control cancer related respiratory symptoms that were getting worse." Reproduced Record, at 129a. We find Dr. DeJager's expert report was sufficient to place the Hospital on notice that he believed there existed an alleged deviation from the standard of care with respect to an interpretation of the CT scan.[1]

—Non-suit as to Dr. John Cohn—

¶ 14 Next, we address the issues raised in Corrado's appeal. Corrado first argues that the trial court erred in entering a non-suit as to Dr. John Cohn. Our Court has stated that:

> [Entry] is proper only if the factfinder, viewing all the evidence in favor of the plaintiff, could not reasonably conclude that the essential elements of a cause of action have been established. When a nonsuit is entered, the lack of evidence to sustain the action must be so clear that it admits no room for fair and reasonable disagreement. A compulsory nonsuit can only be granted in cases where it is clear that a cause of action has not been established and the plaintiff must be given the benefit of all

---

1. In light of our disposition on this issue we need not address Corrado's claim that the grant of a new trial as to the Hospital was correct because the record contained other expert information for the jury to find the Hospital negligent.

favorable evidence along with all reasonable inferences of fact arising from that evidence, resolving any conflict in the evidence in favor of the plaintiff. The fact-finder, however, cannot be permitted to reach a decision on the basis of speculation or conjecture.

*Joyce v. Boulevard Therapy & Rehab. Ctr., P.C.,* 694 A.2d 648, 652–653 (Pa.Super.1997) (citations omitted).

 ¶ 15 In the context of actions for medical malpractice, the plaintiff's evidence must establish that (1) the physician owed a duty to the patient; (2) the physician breached that duty; (3) the breach of duty was the proximate cause of, or a substantial factor in, bringing about the harm suffered by the patient; and (4) the damages suffered by the patient were a direct result of that harm. *Eaddy v. Hamaty,* 694 A.2d 639, 642 (Pa.Super.1997). A plaintiff is required to present an expert witness who will testify, to a reasonable degree of medical certainty, that the acts of the physician deviated from good and acceptable medical standards, and that such deviation was the proximate cause of the harm suffered. *Brannan v. Lankenau Hospital,* 490 Pa. 588, 417 A.2d 196 (1980).

¶ 16 Corrado argues the trial court erred in striking a portion of Dr. DeJager's testimony. Dr. DeJager testified that because the decedent had an 80% likelihood of developing metastatic cancer, repeated CT scans were necessary as part of her follow-up care. He further testified that a procedure called a bronchoscopy should have been performed in 1993, in addition to the CT scan because a bronchoscopy raises the sensitivity level of the CT scan. Counsel for Dr. John Cohn moved to strike that portion of Dr. DeJager's testimony on the basis that it was beyond the scope of his expert report. The trial court sustained the objection and instructed the jury to disregard Dr. DeJager's statement regarding the need for bronchoscopy in 1993. Corrado claims the failure to perform the bronchoscopy in 1993 was a statement within the fair scope of the expert report because the issue at trial was whether Dr. John Cohn was negligent in failing to diagnose the recurrence of decedent's lung cancer in May of 1993. He submits that because the performance of a bronchoscopy as a diagnostic tool increases the sensitivity of a CT scan, as it reduces the risk of a false negative, the failure to perform a bronchoscopy in 1993 is within the report's fair scope.

¶ 17 A review of Dr. DeJager's report reveals *no mention of the necessity to* perform a bronchoscopy in 1993. Nothing in Dr. DeJager's report would have lead Dr. John Cohn to anticipate that Dr. DeJager would express the opinion at trial that a bronchoscopy should have been performed and the failure to do so was a deviation from the standard of care. Dr. DeJager's report did not place Dr. Cohn on notice that the failure to diagnosis necessarily includes the failure to perform a bronchoscopy. Accordingly, any proposed testimony concerning the necessity of a bronchoscopy was outside the scope of Dr. DeJager's report. Furthermore, Dr. John Cohn would have been prejudiced by the introduction of this portion of Dr. DeJager's testimony because he would have been placed in the position of having to cross-examine the doctor on the subject and prepare a meaningful response. We find the trial court properly limited the scope of Dr. DeJager's testimony.

 ¶ 18 Next, Corrado argues a nonsuit on behalf of Dr. John Cohn was improper because he presented sufficient evidence to satisfy his burden of proof against Dr. Cohn through the expert testimony of Dr. DeJager. In response, Dr. Cohn argues that because of Dr. DeJager's failure

to state his opinions with sufficient certainty, the grant of a non-suit was correct. We agree. In *Eaddy v. Hamaty, supra,* our Court stated:

> We acknowledge that an expert need not testify with absolute certainty or rule out all possible causes of a condition. Nor do we require an expert to testify in precisely the language used to enunciate the legal standard. Rather, we review expert testimony in its entirety to assess whether it expresses the requisite degree of medical certainty. "An expert fails this standard of certainty if he testifies 'that the alleged cause "possibly", or "could have" led to the result, that it "could very properly account" for the result, or even that it was "very highly probable" that it caused the result.'"

694 A.2d at 642.

¶ 19 When asked whether he had an opinion based upon a reasonable degree of medical certainty if Dr. John Cohn deviated from the standard of care, Dr. DeJager answered, "more likely than not in my opinion he deviated from the standard of care." Reproduced Record at 404a. Dr. DeJager was then questioned about whether or not the decedent suffered any harm as a result of Dr. John Cohn's deviation from the standard of care, to which Dr. DeJager eventually responded, ". . . more likely than not [the decedent] would have responded to treatment in 1993 as she did a year later when they finally made the diagnosis of recurrent disease, that means that that patient would have been [sic] probably had at least a 15 months symptom free status between 1993 and some time later." *Id.* at 405a. After reviewing his testimony in its entirety, we conclude that Dr. DeJager did not express the requisite degree of medical certainty. Corrado therefore failed to state a *prima facie* case of medical malpractice and the trial court's grant of non-suit was proper.

—Testimony of Dr. Luther Brady—

██ ¶ 20 Corrado next argues that the trial court erred in failing to permit Dr. Luther Brady, M.D. to testify to matters which were within the fair scope of his report.[2] However, Dr. Brady never submitted an expert report. As a result the trial court would not permit Dr. Brady to testify as an expert witness at trial. The crux of Corrado's claim is that the trial court erred in precluding Dr. Brady from testifying as an expert witness at trial because appellees presented no evidence that undue prejudice would have occurred had Dr. Brady testified.

¶ 21 By order dated August 5, 1998 Corrado was required to submit his expert reports by February 5, 1999. By February 5th, Dr. Brady had not been identified as an expert witness, nor had any expert report or answers to interrogatories from Dr. Brady been filed. Corrado asserts that in August 1999 his counsel submitted to appellees a document entitled "Trial Management Order" in which he listed Dr. Brady as an expert. On September 10, 1999, the date set for jury selection, Corrado presented the trial court with Supplemental Responses to Defendants' Expert Witness Interrogatories, which were delivered to defense counsel two days beforehand. In the Supplemental Responses counsel for Corrado stated that Dr. Luther Brady, a treating physician of the decedent, would testify that the failure to treat the decedent with chemotherapy in 1993

---

2. In the heading of subsection d of the argument portion of his brief Corrado also claims that the trial court failed to permit Dr. DeJager to testify to matters which were within the fair scope of his report. In a footnote, Corrado rehashes the same argument with respect to Dr. DeJager's testimony that he made in his first issue on appeal. However, as we have already disposed of that argument, we need not address it again.

was a deviation from the standard of care which decreased her life expectancy. The theory that appellees' alleged negligence not only affected the decedent's quality of life but also contributed to her death was contrary to the opinion of Corrado's expert, Dr. DeJager. Dr. DeJager's report indicated that appellees' negligence did not decrease the decedent's life expectancy. The Supplemental Responses that advanced the theory were signed by counsel for Corrado. Corrado had no expert report or signed and verified answers to interrogatories submitted by Dr. Brady. Corrado at that time asked the trial court for a continuance to obtain an expert report from Dr. Brady. The trial court denied Corrado's request for a continuance. The court ruled that Dr. Brady was precluded from testifying as an expert witness. However, Dr. Brady was permitted to testify as a fact witness.

■■■■■■ ¶ 22 Rule 4003.5 governs the disclosure of an expert's facts and opinions otherwise discoverable under the provisions of Rule 4003.1 and acquired or developed in anticipation of litigation or for trial. *Miller v. Brass Rail Tavern, Inc.,* 541 Pa. 474, 664 A.2d 525 (1995). The Rule requires a party to disclose his expert's opinion prior to trial via answers to interrogatories or by providing a report. The answers or report must be signed by the expert. Pa.R.Civ.P. 4003.5(a)(1)(b). Furthermore, if the identity of an expert witness is not disclosed, Rule 4003.5 authorizes sanctions, such as preclusion of the proposed expert's testimony. Pa.R.Civ.P. 4003.5(b). The sanction authorized by Rule 4003.5 is not mandatory. *Toogood v. Rogal,* 764 A.2d 552, 557 (Pa.Super.2000). Rather, when a discovery violation occurs as a result of a failure to identify an expert witness, "the presiding court must balance the facts and circumstances of each case to determine the prejudice to each party."

*Id.* (quoting *Feingold v. SEPTA,* 512 Pa. 567, 573, 517 A.2d 1270, 1273 (1986)). The court considers the following factors:

> (1) the prejudice or surprise in fact of the party against whom the excluded witnesses would have testified, (2) the ability of that party to cure the prejudice, (3) the extent to which waiver of the rule against calling unlisted witnesses would disrupt the orderly and efficient trial of the case or of other cases in the court, and (4) bad faith or willfulness in failing to comply with the court's order.

*Wolloch v. Aiken,* 756 A.2d 5, 13 (Pa.Super.2000).

¶ 23 Corrado submits that the trial court failed to consider the relevant factors before precluding Dr. Brady from testifying as an expert. This, he argues, constitutes reversible error. He further submits there was no showing of undue prejudice to appellees if Dr. Brady were permitted to testify. In its opinion, the trial court noted the fact that Corrado's expert reports were to be submitted by February 5, 1999. The court also noted that during a pretrial conference the week before trial testimony commenced, Corrado's counsel was informed that he had the weekend to obtain a signed expert report, yet no report was ever submitted. Furthermore, when considering this issue at the outset of trial, the court also considered the prejudice to appellees if Dr. Brady were to testify as an expert. The trial court stated:

> ...[S]ince Doctor Brady's resume, was apparently submitted to counsel two days before jury selection [and] contains over 630 articles by Doctor Brady—sorry, 310 of which were written within the last fifteen years, I think it would be somewhat difficult for anybody to master all that material in order to properly cross-examine on an expert basis when

someone's report has yet to be seen and have them come in tomorrow and testify as experts.

I think the prejudice of a one hundred and eighty degree change in theory within the last two days before trial when [there is] a theory set forth in Doctor DeJager's report which has been on the table for six months, in the absence of a specific report, would be highly prejudicial.

Reproduced Record, at 53b–56b.

¶ 24 We conclude that the sanction of precluding Dr. Brady from testifying as an expert did not constitute any error or abuse of discretion on the part of the trial court. On August 5, 1998, the trial court ordered Corrado to produce answers to expert witness interrogatories by February 5, 1999. Corrado never produced an expert report from Dr. Brady. Instead, seven months later on the first day of jury selection, Corrado presented the trial court with unverified responses to interrogatories. To permit Dr. Brady to testify as an expert would have been highly prejudicial to the defendants, who would have been placed in the position of refuting Dr. Brady's opinions, a witness whose proposed expert testimony was disclosed on the eve of trial. Under such circumstances we find no error with the trial court's decision to preclude Dr. Brady from testifying as an expert and offering an opinion that the defendants' acts or omissions caused or contributed to the decedent's death.

—Dismissal of Wrongful Death Claim—

■ ¶ 25 Corrado next maintains the trial court erred in granting defendants' motion in limine and dismissing the wrongful death portion of the case. At the time of trial, Corrado did not have an expert witness or report stating that the decedent's death was caused by the wrongful act or negligence of any of the defendants. In fact, Corrado's expert witness, Dr. DeJager, issued a report which conceded that the decedent's life expectancy was not impacted by any negligence on the part of the defendants. The report specifically stated " . . . it is not possible to argue that the 10–month delay in starting chemotherapy may have negligently affected [the decedent's] survival expectancy . . . ." Reproduced Record, at 129a.

¶ 26 On August 16, 1999 the defendants filed a motion in limine seeking dismissal of the wrongful death claims based on the foregoing.[3] In response, Corrado presented the trial court with Supplemental Responses to Defendants' Expert Witness Interrogatories, in which counsel for Corrado stated that Dr. Brady would testify that the failure to treat the decedent with chemotherapy in 1993 was a deviation from the standard of care which decreased her life expectancy. However, the answers were not verified by Dr. Brady. The trial court ruled:

Having reviewed the materials, having seen no basis for a wrongful death action in the expert reports of the plaintiff as of the time I reviewed them last night, and since the supplemental response that has been submitted today is not signed by a physician, as required by the rules, and we don't know with certainty what it is Doctor Brady is going to testify to, assuming he is called to testify, an in view of the fact that it is, if I take it on its face value, in distinct contradiction to the reports of plaintiff's experts previously submitted, I see no reason for a wrongful death case.

---

**3.** Dr. John Cohn filed a separate motion in limine on the same date raising the same issues.

Reproduced Record, at 224a –225a. The trial court further stated that even if the answers to the interrogatories were verified by Dr. Brady his opinion would be improper under *Mudano v. Philadelphia Rapid Transit Co.*, 289 Pa. 51, 137 A. 104 (1927)(holding that a plaintiff's case will fail when the testimony of his two expert witnesses is so contradictory that the jury is left with no guidance on the issue), because it was contradictory to Corrado's expert, Dr. DeJager. *Id.* at 228, 137 A. 104.

¶ 27 Corrado argues the motion in limine was improperly granted because the trial court erred in precluding Dr. Brady from testifying as an expert witness at trial. As we have already found no abuse of discretion on the part of the trial court in precluding Dr. Brady from testifying as an expert, this issue necessarily fails. In light of ·the preclusion, Corrado had no expert evidence to substantiate her wrongful death claim. Instead, the only expert report Corrado produced which discussed the issue of whether appellees' acts caused or contributed to the decedent's death was Dr. DeJager's report, which admitted that the appellees did not impact the life expectancy of the decedent. Clearly, the trial court did not err in granting the motion in limine dismissing the wrongful death claim.

### —The Non–Suits—

¶ 28 Corrado next claims that the trial court erred in entering non-suit because counsel for the Hospital and Dr. John Cohn presented evidence during the course of his case in chief. Corrado claims that under the guise of cross-examination of Dr. DeJager counsel for appellees introduced the records of two experts. He further asserts that counsel also presented the jury with a blow-up of a letter from Dr. Julia M. Kennedy which was sent to the experts. Corrado argues the cross-examination of Dr. DeJager with the experts' records and the Kennedy letter constituted presentation of evidence by the appellees which precluded the trial court from entering a compulsory non-suit pursuant to Pa.R.Civ.P. 230.1.

¶ 29 We need not determine whether appellees entered evidence during Corrado's case, however, because the issue is waived. In order to preserve an issue for review, litigants must make timely and specific objections during trial and raise the issue in post-trial motions. *Harman ex rel. Harman v. Borah*, 562 Pa. 455, 471, 756 A.2d 1116, 1125 (2000). At the time appellees moved for a compulsory non-suit, Corrado responded to the motion but made no objection on this basis. Therefore, this issue is waived. *Kelly v. St. Mary Hospital*, 778 A.2d 1224, 2001 PA Super 175; *Hong v. Pelagatti*, 765 A.2d 1117 (Pa.Super.2000).

### —Recusal—

¶ 30 Next, Corrado asserts he is entitled to a new trial because the trial court erred in failing to recuse itself. A party seeking recusal of a judge must provide evidence of the necessity for a disqualification. *Denton v. Silver Stream Nursing and Rehabilitation Center*, 739 A.2d 571, 578 (Pa.Super.1999). Generally, recusal is warranted where the appearance of impropriety arises because of a judge's pecuniary interest in a controversy or because of a consanguineal relationship between the judge and one of the litigants. *Id.* The propriety of a judge's decision on a motion for recusal is reviewed on appeal under an abuse of discretion standard. *Randt v. Abex Corp.*, 448 Pa.Super. 224, 671 A.2d 228, 230 (1996).

¶ 31 Corrado complains that the trial court was "subject to subconscious prejudice which may have arisen as a result of a

variety of factors, including the Court's familiarity with the Appellee [Dr. John Cohn] and one of the witnesses, the Court's prior experience as a plaintiffs' medical malpractice petitioner, and the Court's apparently exaggerated impression of the defense reports...." Corrado's Brief, at 54–55. The trial court's familiarity with Dr. John Cohn stems from the fact the court and Dr. Cohn are members of the same synagogue. The trial court judge stated that she and Dr. Cohn are not in the same circle of friends and have never socialized. The trial judge further stated that she knows Dr. Cohn simply by face to say hello. The witness Corrado alludes to was Dr. Robert Steiner, a named defense witness and a friend of the trial court judge. Dr. Steiner never testified at trial.

¶ 32 Corrado has failed to show by any credible evidence impropriety on the part of the trial judge. He has failed to support his contentions with any specific allegations as to the purported bias or prejudice of the trial judge. Rather, the crux of Corrado's argument is that the trial judge engaged in "subconscious prejudice." Corrado has alleged insufficient grounds on which to show impropriety. Based on our review of the record, we find that the trial court was fully able to dispose of the matter fairly and without prejudice.

—Continuance—

¶ 33 Finally, Corrado argues the trial court erred in failing to grant a continuance of the trial. The trial court is vested with broad discretion in the determination of whether a request for a continuance should be granted, and an appellate court should not disturb such a decision unless an abuse of that discretion is apparent. *Baysmore v. Brownstein,* 771 A.2d 54 (Pa.Super.2001). An abuse of discretion is more than just an error in judgment and, on appeal, the trial court will not be found to have abused its discretion unless the record discloses that the judgment exercised was manifestly unreasonable, or the results of partiality, prejudice, bias or ill-will. *Id.*

¶ 34 Corrado maintains that he filed a petition for extraordinary relief requesting a continuance and that all parties were in agreement to a continuance. The petition was prepared by counsel for Dr. John Cohn and was denied prior to trial without any party requesting reconsideration. Without expounding, Corrado merely asserts the trial court's action was an abuse of discretion. Corrado's conclusory statement is insufficient to demonstrate any abuse of discretion on the part of the trial court.

¶ 35 Corrado also submits that all parties requested a continuance during trial because of the recent publication of a newspaper article about medical malpractice litigation. The record reveals that Corrado's counsel stated that unless the matter could be rescheduled for a new trial following a lengthy period of time after any impact the article may have is gone, he would object to removing the jury. Counsel further stated because of scheduling problems with his witnesses, would ask that the trial move forward with the present jury panel. Reproduced Record, at 235a. Corrado's qualifying statements demonstrate he did not request a continuance but rather opposed one. Under these two circumstances in which Corrado maintains he requested a continuance we find no error or abuse of discretion entitling Corrado to a new trial.

¶ 36 Order affirmed.