## Velasquez v. Nickischer

C.P. of Lehigh County, no. 2002-C-2880V.

*Nadeem A. Bezar,* for plaintiff.

*Mary Ann Martillotti* and *Alan W. Focht,* for defendants.

REIBMAN, *J.,* December 23, 2004—Plaintiff Renee Velazquez filed suit, alleging defendants were negligent in failing to diagnose the heart condition which apparently led to the death of her husband, Raul Velazquez, in the form of a catastrophic cardiac event. Plaintiff has secured an expert who produced a report. Defendants contend the report is defective in various respects and thus move in limine to preclude testimony at trial based on that report. Plaintiff, in turn, moves to preclude testimony by defendants' experts on the grounds that such evidence would be merely cumulative and that one of the experts lacks qualification in the appropriate field of medicine. The motions will be addressed seriatim.

## BACKGROUND

Gleaned largely from the report of plaintiff's expert, Richard N. Podell M.D., the facts are as follows. On September 16, 1999, Raul Velazquez (decedent) appeared

at the offices of defendant Emergicenter complaining of pain in his left elbow and knee. He came under the care of defendant Brent Nickischer D.O., who performed a full physical examination. Standing five feet, 11 inches tall, Mr. Velazquez weighed in at 321.4 pounds. Defendant Nickischer's records also indicate that Mr. Velazquez reported that he smoked a pack of cigarettes a day and consumed alcohol. His blood pressure registered at 138 over 84, and he exhibited a total cholesterol reading of 202 and an HDL level at 22mg percent. Dr. Nickischer prescribed Celebrex for the joint pain.

The parties appear to dispute what follow-up care was ordered at that point. In any event, Mr. Velazquez next presented himself to Dr. Nickischer on July 26, 2000, complaining of continued pain in his knee. His weight had increased to 329.4 pounds and his blood pressure remained relatively constant at 138 over 86. Records kept by Dr. Nickischer do not indicate that he discussed cardiac risk factors with Mr. Velazquez or performed a physical examination of his heart. Dr. Nickischer apparently did, however, draw blood for a liver-function test. He then wrote a prescription for 60 doses of Celebrex at 200mg, with 12 refills.

In July 2001, Mr. Velazquez' wife, Renee, contacted Dr. Nickischer, apparently requesting a note so that Mr. Velazquez could attend Boy Scout camp with his sons. Plaintiff alleges that without actually examining Mr. Velazquez, but instead relying on Mrs. Velazquez' representation that her husband was doing well, Dr. Nickischer provided a medical form indicating Mr. Velazquez was medically fit to participate in camp activities and that his cardiovascular and skeletomuscular systems were normal.

Before ever attending the camp, however, Mr. Velazquez experienced severe back pain and began sweating. He fell unconscious and could not be revived by emergency medical personnel. An autopsy dated July 15, 2001, indicated that Mr. Velazquez had an "abnormal heart" and died of "coronary artery atherosclerosis." Mrs. Velazquez subsequently commenced this action against Emergicenter and Dr. Nickischer alleging negligence in the failure to diagnose Mr. Velazquez' heart condition. Both sides have filed motions in limine to preclude certain testimony at the upcoming trial.

## CAUSATION TESTIMONY

In their widest-ranging motion, defendants argue that plaintiff's expert should be precluded from offering any causation testimony because his report fails to state with reasonable medical certainty that the alleged deviations from care resulted in the harm suffered by the decedent. Plaintiff disagrees, maintaining that the report meets the applicable standard for causation testimony in this Commonwealth.

The Superior Court has held that in order to state a prima facie case for medical malpractice, a plaintiff must proffer an expert opinion stating "to a reasonable degree of medical certainty that the acts of the [allegedly negligent] physician deviated from good and acceptable medical standards, and that such deviation was the proximate cause of the harm suffered." *Hoffman v. Brandywine Hospital*, 443 Pa. Super. 245, 255, 661 A.2d 397, 402 (1995) (quoting *Mitzelfelt v. Kamrin*, 526 Pa. 54, 62, 584 A.2d 888, 892 (1990)). *Hoffman* involved a plaintiff suing on behalf of her deceased mother who had contracted

and succumbed to AIDS as a result of a tainted blood transfusion. *Id.* at 249, 661 A.2d at 399. In that case, the court held as too indefinite, the testimony of an expert who opined that "*in all likelihood* [defendant's negligence] delayed the administration of anti-viral medication which *may have hastened* the onset of opportunistic disease in [the decedent] and caused her illness to progress sooner than it might have." *Id.* at 255, 661 A.2d at 402. (emphasis in original) Accordingly, it upheld summary judgment in favor of the doctor who treated the plaintiff after she had been diagnosed as HIV positive. *Id.* at 256, 661 A.2d at 402.

In the case relied on by *Hoffman* for the relevant rule, however, the Supreme Court specifically addressed the degree of certainty respecting causation that is necessary to present a prima facie case in a failure-to-diagnose case. *Mitzelfelt v. Kamrin,* 526 Pa. 54, 584 A.2d 888 (1990). The plaintiff in *Mitzelfelt* alleged that negligently performed surgery left her partially paralyzed, incontinent, and in constant pain. 526 Pa. at 58, 584 A.2d at 890. The plaintiff's expert testified that error in the operating room allowed her blood pressure to decrease and that the drop in pressure was sufficient to compromise the blood flow to the spinal cord, thereby causing harm to the plaintiff. *Id.* at 59-60, 584 A.2d at 891. On cross-examination, however, the expert admitted that he could not state to a reasonable degree of medical certainty that the drop in pressure caused the plaintiff's injuries; instead, he asserted only that "it could have." *Id.* at 61, 584 A.2d at 891. The jury awarded plaintiff $3,000,000, but the Superior Court reversed. It held plaintiff had failed to present a prima facie case of malpractice. *Id.*

Reversing the appellate court, the Supreme Court explained that in cases involving an alleged failure to diagnose which results in an increased risk of harm, a plaintiff need only present "sufficient testimony to establish that (1) the physician failed to exercise reasonable care, that (2) such failure increased the risk of physical harm to the plaintiff, and (3) such harm did in fact occur . . . ." *Id.* at 68, 584 A.2d at 894-95. Once a plaintiff proffers such evidence, "then it is a question properly left to the jury to decide whether the acts or omissions were the proximate cause of the injury." *Id.* at 68, 584 A.2d at 895. As the court elaborated, "The jury, not the medical expert, then has the duty to balance probabilities and decide whether defendant's negligence was a substantial factor in bringing about the harm." *Id.* (quoting *Hamil v. Bashline,* 481 Pa. 256, 273, 392 A.2d 1280, 1288-89 (1978) (case in which plaintiff's expert opined that proper treatment would have afforded 75 percent chance of survival)); see also, *Sutherland v. Monongahela Valley Hospital,* 856 A.2d 55, 60-61 (Pa. Super. 2004) (applying *Hamil* and citing *Mitzelfelt* with approval in holding "plaintiff must only introduce evidence that a defendant's negligent act or omission increased the risk of harm, and that the harm was . . . sustained"); cf. *Corrado v. Thomas Jefferson University Hospital,* 790 A.2d 1022, 1031(Pa. Super. 2001) (determining testimony to be insufficient when expert opined that defendant "more likely than not" *deviated from the requisite standard of care* and testified that "more likely than not" decedent would have responded positively to treatment).

Finally, in determining whether it will suffice on the subject of causation, an expert's testimony must be "taken

as a whole." *Mitzelfelt, supra,* 526 Pa. at 66, 584 A.2d at 894. Experts need not employ "magic words," and, correspondingly, courts must "look to the substance of their testimony to determine whether it meets the standard required." *Id.* at 67, 584 A.2d at 894.

In this case, plaintiff has satisfied the rather lenient standard articulated by our Supreme Court. Specifically, plaintiff alleges that the decedent appeared at defendant Emergicenter complaining of knee and elbow pain, and was treated by defendant Nickischer. He weighed in excess of 300 pounds, reported a history of tobacco and alcohol use, and, according to plaintiff's expert, had cholesterol levels constituting "major cardiac risk factors." Plaintiff's expert observes in his report that when the decedent presented himself in such condition, defendant Nickischer was obliged to request medical history and order testing, including an electrocardiogram and an exercise stress test. He then opines that the failure to undertake that course of treatment and, instead, prescribe only Celebrex amounted to "a deviation from appropriate standards of care." (7-8) His report then goes on to state:

"To a reasonable degree of medical certainty, had an electrocardiogram been done in the fall of 1999, this would have increased the likelihood that abnormalities would have been found that would have led to further cardiac evaluation. To a reasonable degree of medical certainty, had an exercise stress test been done in the fall of 1999, this would have increased the likelihood that abnormalities would have been detected and appropriate cardiology care would have been implemented. Appropriate cardiology treatment begun in 1999 would have reduced the progression of Mr. Velazquez's coronary ar-

tery disease, and increased the likelihood of preventing his sudden death in July of 2001.

"To a reasonable degree of medical certainty, an electrocardiogram or an exercise stress test done in July 2000 would have increased the likelihood of detecting cardiac abnormalities. This would have led to appropriate cardiology care, which would have reduced the progression of Mr. Velazquez' coronary artery disease and increased the likelihood of preventing his sudden death.

"To a reasonable degree of medical certainty, had Dr. Nickischer monitored Mr. Velazquez on a regular basis, the likelihood would have increased that Dr. Nickischer would have recognized that Mr. Velazquez was at risk for coronary heart disease. This should have led to evaluating for cardiac problems. Had this been done, Mr. Velazquez' progressing coronary heart disease would have been recognized and appropriate cardiac care would have been implemented. This would have prevented Mr. Velazquez' death.

"To a reasonable degree of medical certainty, if Dr. Nickischer had insisted that he see Mr. Velazquez in order to fill out the boy scout camp physical form in July 2001, the examination at that time would have increased the likelihood that Dr. Nickischer would have suspected the presence of unstable coronary heart disease. This would have lead [sic] to an urgent cardiac referral or hospitalization. Mr. Velazquez' death would have been prevented. An EKG would have been abnormal. An urgent cardiac referral or hospitalization would have followed. Mr. Velazquez' death would have been prevented or at least the likelihood of his death would have been drastically reduced.

"Mr. Velazquez died because of severe atherosclerosis.
. . .

"To a reasonable degree of medical certainty, had medical or surgical intervention effectively prevented his death in July 2001, he would have been expected to live a normal or near normal life span." (Dr. Podell's rept. at 8-10.)

Although the report speaks in terms of "likelihood," pursuant to the decisional law in this Commonwealth noted above, it remains for the finder of fact to "balance the probabilities" and ultimately decide whether any negligence on the part of defendant Nickischer substantially contributed to the harm incurred by Mr. Velazquez. Moreover, the report indicates that the relevant conclusions are "to a reasonable degree of medical certainty." Because the testimony of plaintiff's expert will likely prove useful to the panel in its deliberations, the motion in limine to preclude causation testimony will be denied. Pa.R.E. 702.

### Medical Records

Defendants also move to preclude so much of Dr. Podell's report (and related testimony at trial) that alleges defendant Nickischer failed to obtain an adequate medical history from the decedent, including his medical records. Defendants argue that the report fails to establish a causal link between this alleged misconduct and the harm incurred by the decedent. Specifically, defendants point to the following language in Dr. Podell's report:

"When Dr. Nickischer first began to care for Mr. Velazquez he was required to request that Mr. Velazquez

obtain prior medical records for review. There is no indication that Dr. Nickischer did this, which was also a deviation. (Certainly, information not contained in his own records about the patient's past medical history would have been helpful.)" (Defs. mtn. in limine, 3/4/04, at 2 (quoting Podell rept. at 7).)

As indicated above, in reviewing an expert's testimony or, in this case, a report, a court is required to view the same in its entirety and "look to the substance of th[e] testimony to determine whether it meets the standard required." *Mitzelfelt, supra,* 526 Pa. at 67, 584 A.2d at 894. In fact, earlier in the report, the connection between the medical history and the failure to diagnose coronary artery disease appears more explicit. There, Dr. Podell stated:

"Dr. Winegard had been Mr. Velazquez' main physician in 1996 and 1997. His records show that Mr. Velazquez had a family history of heart disease in a grandfather and an uncle, and a history of strokes in a grandfather. Blood pressure on June 27, 1997 was 158/90 and 150/90. There was a diagnostic impression of high blood pressure. Weight had increased from 304.5 pound to 322 pounds. A lipid panel showed a total cholesterol of 185, and LDL of 127, and a cholesterol ratio of 6.85. There is no indication in the chart that Dr. Nickischer requested that Mr. Velazquez authorize a transfer of his prior medical records for Dr. Nickischer's review."

Thus, fairly read in the context of the report as a whole, Dr. Podell's comments on the lack of adequate medical history appear inextricably related to the general thesis of his report, which plainly appears to be that Dr. Nickischer failed to adequately diagnose decedent's coro-

nary artery disease, which, in turn, led to an increased risk of harm to the decedent. Thus, he did not, nor does the law require him to, pause after every sentence of his report and explain how each individual misstep directly related to the harm suffered. Rather, the comments relating to the failure to request medical history indicate that this amounted to one facet of defendant Nickischer's alleged failure to diagnose decedent's condition. Read in context of the broader document, the allegations concerning the failure to examine medical records, by extension, possess the necessary causal connection to the increased risk decedent is alleged to have faced from an inadequately diagnosed condition of atherosclerosis, an ailment to which he ultimately succumbed. Defendants' motion to preclude this testimony will, therefore, be denied.

## Celebrex Testimony

Defendant also moves in limine to preclude testimony regarding defendant Nickischer's alleged shortcomings in his administration of Celebrex to decedent. When decedent first presented himself at the Emergicenter, Dr. Nickischer apparently prescribed Celebrex to relieve pain. (Pl. exp. rpt. at 2.) Plaintiff's expert now opines:

"Dr. Nickischer also deviated in prescribing long-term Celebrex to Mr. Velazquez, given Mr. Velazquez' risk for developing high blood pressure, as well as his increased risk for gastrointestinal bleeding complications. Dr. Nickischer also deviated by failing to explain these risks to Mr. Nickischer [sic] and also Celebrex's potential adverse interactions with alcohol.

"Dr. Nickischer also deviated by failing to properly monitor Celebrex. He should have required medical vis-

its to monitor blood pressure and stool testing for occult blood at least every three months. Each prescription plus refills should have been for no more than three months at a time.

"If Dr. Nickischer wished to maintain Mr. Velazquez on Celebrex, he was required to see Mr. Velazquez at least every three months to check for potential side effects in the form of signs and symptoms of high blood pressure, gastritis and internal bleeding. At the very minimum, this would have ensured Mr. Velazquez' regular return to the office." (Pl. exp. rpt. at 7-8.)

Defendant argues that by the expert's own admission, the side effects of Celebrex consist of high blood pressure, gastritis and internal bleeding and do not include atherosclerosis. Hence, they object on the ground that no causal relationship exists between any negligence regarding Celebrex and the harm decedent actually suffered.

Plaintiff counters that testimony regarding the failure to monitor Celebrex will be relevant at trial. She claims that, in deposition testimony, Dr. Nickischer stated that he did not perform cardiac evaluations on the decedent because the latter refused to come to the office. She thus claims that the failure to require follow-up visits evidences Dr. Nickischer's lack of effort to have the decedent return for cardiovascular evaluation.

It plainly appears that the atherosclerosis from which Mr. Valazquez suffered is not a result within the risk of Celebrex, as its side effects have been described by plaintiff's own expert. Thus, it is incumbent upon plaintiff to demonstrate relevance of this evidence on some

other basis. And the argument that this testimony will prove probative of Dr. Nickischer's efforts at proper follow-up care on the issue of coronary artery disease proves unavailing.

According to plaintiff, Dr. Nickischer claims that the decedent refused to undergo an EKG or otherwise report to his office for further cardiovascular evaluation. (Pl. brf., 3/16/04, at 3-4.) If that, forsooth, is Dr. Nickischer's defense, the pertinent issue becomes Dr. Nickischer's credibility on this score, not whether he availed himself of all possible artifices to circumvent the decedent's obstinacy. Unsurprisingly, plaintiff has presented no authority suggesting that a physician owes his patient such a duty.

The only remaining relevance this issue would have is the tendency to demonstrate that, because Dr. Nickischer was negligent in his oversight of Celebrex, he must have been similarly deficient in his care relating to the decedent's heart condition. This use of evidence, however, is expressly forbidden under the rules. See Pa.R.E. 404(b) (evidence of other acts not permissible to show action in conformity therewith).

Accordingly, defendants' motion will be granted. Plaintiff's expert shall be precluded from opining on defendant Nickischer's alleged deviation from applicable standards in the administration of Celebrex to decedent.

## DEFENDANTS' EXPERTS

Plaintiff moves to preclude testimony of defense experts Steven Meister M.D. and Bruce Silver M.D. Plaintiff argues that both Dr. Meister's and Dr. Silver's testi-

mony would be merely cumulative of that offered by defendant Nickischer himself as to the applicable standard of care required of a family physician. Plaintiff also maintains that Dr. Meister, "as an academic cardiologist," lacks qualification to testify about the standard of care applicable to a family physician.

The first of these arguments may be addressed rather quickly. The Rules of Evidence provide that "[a]lthough relevant, evidence may be excluded . . . by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Pa.R.E. 403. The rule, of course, has been crafted with the permissive "may" and, accordingly, a court is vested with considerable discretion in determining whether evidence will be kept from the jury under this rationale. *Concorde Investments Inc. v. Gallagher,* 345 Pa. Super. 49, 56, 497 A.2d 637, 641 (1985).

Plaintiff's sole contention is that because defendant himself is a practitioner in the field of family practice, he is qualified to opine on the applicable standard of care. Hence, the argument runs, any additional testimony by Drs. Meister and Silver would only be duplicative.

While Dr. Nickischer may indeed be qualified to testify on the subject, it requires little discussion or analysis to realize that it would behoove any litigant to have a third party provide an ostensibly independent perspective on any matter of importance at trial. If for no other reason, that course of action may be prudent in order to forefend or rebut any implied or express attack on a party's credibility or out of a concern, certainly not unfounded, that any testimony offered by one accused of wrongdoing could be viewed by the fact-finder as self-serving. The motion will thus be denied.

Plaintiff also moves to preclude testimony of Dr. Silver on the standard of care applicable to a family physician. Observing that Dr. Silver is "an academic cardiologist," plaintiff maintains that he is therefore not qualified in the field of family practice. Defendants counter that the testimony of Dr. Silver as expert in cardiology is necessary to rebut the allegation of plaintiff's expert that defendant Nickischer failed to pursue adequate treatment of Mr. Velazquez' heart condition.

The rule in Pennsylvania is clear that "experts in one area of medicine may be found qualified to address other areas of specialization where the specialties overlap in practice or where the specialist has had experience in a related field of medicine." *Corrado, supra,* 790 A.2d at 1028. Normally, this issue arises in the context of expert of a more general stripe attempting to opine in a more specialized field. See *id.* (citing cases). The concern is that the intricacies of the sub-field are not known by the generalist.

Here, however, the opposite scenario obtains: plaintiff complains that a "super specialized" physician cannot opine on the standards applicable to a more generalized family practice. Were plaintiff in the position of being held to a higher, specialized standard of care because of a "super-specialized" expert's testimony, the concern would be valid. In view of the manner in which defendants proffer this expert testimony, however, the objection proves unfounded. Defendant Nickischer, of course, is the physician on trial, not plaintiff. Accordingly, he proposes to present the testimony of the specialist who presumably will opine that, even in the opinion of one trained in the specific sub-specialty of cardiac care, defendant did not deviate from the applicable stan-

dard.[1] Accordingly, plaintiff's motion in limine will be denied.

## ORDER

And now, December 23, 2004, upon consideration of defendants' motions in limine, filed on March 4 and 8, 2004, and plaintiff's responses thereto, filed on March 12, 15, 16, and 19, 2004, and upon plaintiff's motion in limine, filed on February 26, 2004, and defendants' response thereto, filed on March 12, 2004, and for the reasons set forth in the accompanying opinion:

It is ordered that defendants' motion to preclude all causation testimony of plaintiff's expert, Richard N. Podell M.D., is denied;

It is further ordered that defendants' motion to preclude testimony of Richard N. Podell M.D., regarding an alleged failure to obtain the decedent's medical records is denied;

It is further ordered that defendants' motion to preclude testimony of Richard N. Podell M.D., regarding deviation of care relating to the prescription and monitoring of the drug Celebrex is granted;

It is further ordered that plaintiff's motion to preclude testimony of defendants' experts, Steven G. Meister M.D., and Bruce Silver M.D., is denied.

---

1. It will be noted, however, that nothing in this opinion suggests that a specialist is entitled to "water down" his standards to reflect what he might believe a generalist would know. Consistent with case law cited above, he may testify only in terms of his direct knowledge derived from his training and experience.