J-A29030-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| IN THE INTEREST OF: A.R., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| APPEAL OF: M.R., MOTHER | No. 508 WDA 2016 |

Appeal from the Order March 11, 2016
In the Court of Common Pleas of Allegheny County
Family Court at No(s): CP-02-DP-0001680-2015

BEFORE:  DUBOW, J., MOULTON, J., and MUSMANNO, J.

MEMORANDUM BY MOULTON, J.:                    **FILED DECEMBER 15, 2016**

M.R. ("Mother") appeals from the March 11, 2016 order of adjudication and disposition finding that:  A.R. ("Child") was dependent; the Allegheny County Office of Children, Youth and Families ("CYF") made reasonable efforts to prevent or eliminate the need for removal; and Child was to remain in foster care, as that was the least restrictive placement that met Child's needs.  We affirm.

The trial court set out the following factual and procedural history:

> The parties appeared on November 16th, 2015, December 16th, 2015, January 13th, 2016, February 12th, 2016, February 26th, 2016 and March 11th, 2016 for Shelter Review and Adjudicatory Hearings.  Ultimately, [Child] was adjudicated dependent under 42 Pa.C.S. §6302(1).  At each hearing,[1] the Court found that [CYF] made reasonable efforts to prevent or eliminate the need for removal of the child from [Mother's] care.  Mother filed a timely appeal in this matter alleging that the Court acted unreasonably in finding that CYF made reasonable efforts

to prevent or eliminate removal, by placing the child in stranger foster care at the dispositional phase of the case and that Mother's due process rights were violated by allowing multiple continuances. For the reasons set forth below, the orders of this Court should be affirmed.

[1] With the exception of the first shelter hearing, which was conducted by Hearing Officer James Alter.

. . .

The child was born [in November 2015]. CYF received a referral . . . from the hospital staff regarding Mother's ability to provide basic care for the infant. The staff's concerns centered on Mother's alleged inability to parent the child based upon her history of bipolar disorder, depression, and mild retardation. CYF was able to identify the potential father, M.W. (hereinafter Father), but could not locate him. The caseworker attempted to locate Father at his last known address but was unable to do so prior to removal.

CYF was granted an Emergency Custody Authorization order that gave them permission to place the child in shelter care. A Shelter Hearing was held on November 16th, 2015 before Hearing Officer James Alter. The Court ordered CYF to file a Petition for Dependency. Based upon the age of the child, Mother's mental health concerns, and not being able to locate Father, the Court ordered it was reasonable for the child to remain in care. Additionally, the Court held that based upon the emergency nature of the situation, safety consideration and the circumstances of the family, the lack of services were reasonable. The Court ordered CYF to investigate possible family placements and prepare a Family Finding Report.

A Petition for Dependency was filed on November 16th, 2015. The family appeared before this Court on December 16th, 2015 for an Adjudicatory Hearing on aforementioned Petition. Both Mother and Father appeared, and Father requested counsel as well as a paternity test. Father presented with obvious mental limitations, and the Court had concerns about his capacity to understand the proceedings. Additionally, it was discovered that Father had relocated to Philadelphia. The Court advised Father to obtain counsel, and he was given the brochure for the

Juvenile Court Project Office. Additionally, CYF provided the parties with over 300 pages of reports regarding Mother's mental health treatment. The Court ordered that genetic testing be completed that day, and that Mother attend an individual and interactional evaluation by Allegheny Forensic Associates (hereinafter AFA). Counsel for Mother requested additional visits and that CYF make a referral to the Office of Intellectual Disability (hereinafter OID) for a parenting assessment. The Court agreed to increase Mother's visitation but wanted Mother to complete the AFA evaluations prior to being referred to the OID. All parties were in agreement with the continuance.

The parties appeared again on January 13th, 2016. There was discussion about how best to address Mother's multiple and conflicting diagnoses as contained in the records provided by CYF at the previous hearing. There were concerns that Mother had a mental retardation diagnosis along with an intellectual disability. All parties expressed concern over whether Mother's parenting needs may be best met by Achieva[2]. There was contradictory information as to the level Mother was functioning on the [i]ntellectual disability scale and her specific needs were unknown. CYF had not made referrals for the AFA evaluations pending the paternity testing. Paternity tests confirmed that M.W. was indeed the biological father of the child; however, Father did not appear at the hearing. CYF was in communication with the Office of Child Youth and Families in Philadelphia for the purpose of investigating Father's living arrangements.

[2] This organization provides services to individuals suffering from moderate to severe intellectual disabilities. Achieva offers parenting supports for disabled individuals as well as their families.

CYF requested a continuance to investigate Father's ability as a ready, willing and able parent, as well as to make referrals for AFA evaluations for Mother and Father. Mother's counsel objected to any further delay alleging that she was ready, willing and able to care for the child. The Court granted the continuance based on overall lack of information about Mother's mental health status. The Court was satisfied that Mother was receiving adequate mental health treatment and that a brief delay was

- 3 -

reasonable in order to determine Mother's exact diagnosis. The Court ordered that CYF make a referral for expedited AFA evaluations.

The parties next appeared on February 12th, 2016. Father appeared at this hearing but was again unrepresented. The Court expressed a continued concern that Father did not fully understand the proceedings. Father requested a continuance to obtain an attorney. Mother had not yet attended her AFA evaluations as they were scheduled for the week following that hearing[3]. Mother's counsel strenuously objected to any further delays in the proceedings and requested that the child be returned to Mother's care. Ultimately, the Court continued the case two weeks so that Father could retain counsel[4] and so the Court would have the benefit of reviewing the reports from the AFA evaluations. The same concerns surrounding Mother's mental health diagnosis persisted and the Court believed the AFA evaluator to be in the best position to recommend services for the family.

[3] The AFA referral was made on January 13th, 2016 by CYF caseworker Heather Lunn[.]

[4] The Court asked the CYF caseworker to accompany him to the Juvenile Court Project's Office to apply for counsel, which she agreed to do.

An Adjudicatory Hearing was held on February 26th, 2016. Father again appeared without an attorney[5]. The Court was able to locate a conflict parent advocate to represent Father after a brief delay in the proceedings. Father's counsel made a request that Father's portion of the case be continued. The Court granted this request but permitted Mother's case to be presented. CYF Supervisor Wayne Noel, CYF caseworker Heather Lunn, Mother's psychiatrist Dr. Sharon Rector[,] and Mother testified at the hearing[6]. Evidence was presented that Mother was involved in comprehensive mental health treatment at Turtle Creek Valley MHMR (hereinafter Turtle Creek). Mother was receiving a wide array of services and had an entire treatment team. Dr. Rector testified as to some of the services that Mother was receiving as well as some of her goals. She was also able to observe an hour long visit with Mother and the child. The doctor felt comfortable

opining that Mother was able to care for the child despite not having any formal training in parent-child bonding or parenting generally. It was concerning that she could opine about this so clearly after only observing Mother with the child for one hour. Strangely enough, Dr. Rector was unable to provide an explanation as to why she had changed Mother's intellectual disability diagnosis several times[7]. In fact she was not even sure about Mother's IQ score, which is a vital component to determining the level of an individual's intellectual disability. Dr. Rector skirted many questions during cross examination about this very issue. The Court was in no better position to determine what Mother's diagnosis was after Dr. Rector's testimony.

[5] Father failed to provide the requisite financial information.

[6] Mother attended the Achieva evaluations on January 26th, 2016 and February 1st, 2016 as well as her AFA evaluation on February 1st, 2016.

[7] Despite the fact that she had been treating Mother since May of 2015.

At the hearing, Mother was candid about her need for services before the child could return to her home. Mother lacked basic knowledge regarding Child's medical needs. She had taken some basic parenting classes but still appeared to not fully understand the seriousness of parenting an infant. She testified that she was not current on rent and that maternal grandmother was residing in her home. This was a concern as she was not listed on the lease and Section 8 prohibits additional occupants not known to their agency. Maternal Grandmother worked outside of the home and could not provide around the clock supervision.

The parties received the Achieva recommendations prior to the hearing but had only recently received the results of the AFA evaluation. CYF did not have the opportunity to implement additional services prior to receiving the report from the AFA evaluations. Both evaluations recommended additional services to assist Mother with parenting. The case lasted a number of hours but ultimately had to be continued because both Mother and KidsVoice had to present their cases[8]. The case was continued two weeks

and the Court ordered that Mother have as many in home visits as possible[9].

[8] The AFA evaluat[or], Dr. Patricia Pepe, was also unavailable to testify on that date.

[9] Mother was posted for services on March 9th, 2016 specifically for assistance in the areas of parenting skills development, child development and hands on parenting training. CYF was also able to assess a maternal aunt but she failed to follow up with the agency.

The case reconvened on March 11th, 2016 and Father stipulated to dependency. Mother's therapist from Turtle Creek, Karen Moller, foster mother, CYF case supervisor Autumn Smith, Dr. Patricia Pepe, Achieva representative Julianne Benzik, and both parents testified at the hearing. The therapist testified that she had been working with Mother on a regular basis and that Turtle Creek was able to address her mental health needs. CYF continued to work with Mother to address her needs through services although she had not been accepted for services as of the date of the hearing. CYF had been working with Mother to develop a safety plan for eventual return as well as following up on referrals for intensive services. Mother was able to have an in-home visit prior to hearing. The visit went well, but she needed assistance in preparing a bottle as well as with comforting the child when he cried.

Dr. Pepe provided testimony as to the AFA evaluation of Mother conducted on February 17th, 2016. She was the first mental health professional to complete an IQ test of Mother, which was identified as being 77. Dr. Pepe diagnosed Mother with Bipolar disorder, depression and borderline intellectual functioning. It was her opinion that Mother did not present with moderate intellectual disability either by way of her IQ score, achievement testing, or adaptive behavioral functioning testing. It was ultimately her opinion that Mother did not possess a comprehensive understanding of the Child's needs and that she would benefit from parent education and parent modeling training. Dr. Pepe opined that a professional recommendation for services was needed to address Mother's level of functioning and parenting capabilities

prior to implementing services. After considering the evidence, the Court adjudicated the child dependent and ordered that he remain in placement. CYF was ordered to implement the services recommended by the AFA evaluation and for in-home visits to continue.

Opinion, 5/24/2016, at 1-5 ("1925(a) Op."). On April 11, 2016, Mother filed a timely notice of appeal.

Mother raises the following issues on appeal:

DID THE TRIAL COURT ABUSE ITS DISCRETION BY MAKING A FINDING OF FACT THE CYF HAD MADE REASONABLE EFFORTS TO AVOID REMOVAL WHEN THE RECORD DOES NOT SUPPORT SUCH A FINDING?

DID THE TRIAL COURT ABUSE ITS DISCRETION BY REFUSING TO RETURN A.R. TO [MOTHER'S] CARE WITHOUT A RECORD OF CLEAR NECESSITY TO JUSTIFY THE REMOVAL?

DID THE TRIAL COURT ABUSE ITS DISCRETION BY ALLOWING THE MATTER TO BE DELAYED MONTH AFTER MONTH WITHOUT ANY CONSIDERATION OF [MOTHER's] RIGHT TO THE CARE AND CONTROL OF HER CHILD?

Mother's Br. at 7.

In dependency cases, this Court reviews a trial court order finding a child dependent for an abuse of discretion. ***In re R.J.T.***, 9 A.3d 1179, 1190 (Pa. 2010). This Court must "accept the findings of fact and credibility determinations of the trial court if they are supported by the record." ***Id.***

Mother first argues that the trial court's finding that CYF made reasonable efforts to prevent Child's removal from Mother's care was unsupported by the record. Mother maintains CYF determined that services could not be provided until it knew the issues Mother faced, but did not take appropriate steps to discern the issues. She notes CYF did not refer Mother

- 7 -

to Dr. Patricia Pepe for evaluation until approximately 60 days after Child was removed from Mother's care. Mother further argues that the record also does not support the trial court's conclusion that the records from Turtle Creek, which included differing intellectual disability diagnoses, justified CYF's failure to make reasonable efforts. Mother maintains that, even without knowing the severity of Mother's intellectual ability, CYF should have offered support, such as in-home services.

A trial court must make determinations regarding whether CYF made reasonable efforts to prevent placement and removal. **See** 42 Pa.C.S. §§ 6332(a), 6351(b).[1]

_____

[1] Section 6332(a) provides:

> An informal hearing shall be held promptly by the court or master and not later than 72 hours after the child is placed in detention or shelter care to determine whether his detention or shelter care is required under section 6325 (relating to detention of child), whether to allow the child to remain in the home would be contrary to the welfare of the child and, if the child is alleged to be delinquent, whether probable cause exists that the child has committed a delinquent act. . . . If the child is alleged to be a dependent child, the court or master shall also determine whether reasonable efforts were made to prevent such placement or, in the case of an emergency placement where services were not offered and could not have prevented the necessity of placement, whether this level of effort was reasonable due to the emergency nature of the situation, safety considerations and circumstances of the family.

42 Pa.C.S. § 6332.

*(Footnote Continued Next Page)*

The trial court concluded that:

> Mother argues that CYF could have implemented additional services to prevent or eliminate the need for removal. However, in-home services are not a cure all. Each case presents with unique facts and circumstances. This case was particularly difficult due to the age of the child and potential safety risk that return presented if Mother was suffering from a moderate intellectual disability. Rather, it was a challenge to match a parenting program or a service provider with Mother based on the wide spectrum of diagnoses made by Turtle Creek MHMR. Additionally, one of the most intensive services that CYF often refers, Achieva, is more appropriate for an individual suffering from moderate intellectual disability. CYF did refer Mother for an assessment with Achieva despite the absence of an IQ score from Turtle Creek's records. Mother has been receiving mental health treatment for most of her adult life at Turtle Creek Valley MHMR. Although the Court believed Dr. Rector's testimony to be contradictory and convoluted,

*(Footnote Continued)* ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

Section 6351 provides:

> Prior to entering any order of disposition under subsection (a) that would remove a dependent child from his home, the court shall enter findings on the record or in the order of court as follows:
>
> . . .
>
> (2) whether reasonable efforts were made prior to the placement of the child to prevent or eliminate the need for removal of the child from his home, if the child has remained in his home pending such disposition; or
>
> (3) if preventive services were not offered due to the necessity for an emergency placement, whether such lack of services was reasonable under the circumstances; or . . .

42 Pa.C.S. § 6351(b).

it was still satisfied that Mother was receiving some level of treatment at Turtle Creek. She had the opportunity to meet with her treatment team multiple times a month to address her mental health needs.

The team worked on everything from establishing positive relationships to budgeting. Mother also continued to have regular visits and attended medical appointments. CYF also made reasonable efforts to locate both maternal and paternal relatives as placement options. CYF did make contact with authorities in Philadelphia to ascertain whether Father was a viable placement option. Maternal grandmother was not an option because her mere presence in the family home jeopardized the one area of stability that Mother possessed, housing.

. . .

The Court was not willing to risk the safety of an infant when it was unclear what services were needed. It is certainly not the position of the Court that a newborn child should be removed from his parents care in the excess of 100 days without any services. But that is simply not the case here. Based upon the disparities between the levels of functioning, CYF was unable to implement specific services for Mother. This Court was satisfied that an AFA evaluation would help CYF to remedy the issues. The AFA evaluation was the first time that the Court and the parties were able to determine that Mother was suffering from borderline intellectual disability. And as such, CYF was able to develop a plan to address Mother's specific needs.

The Court acknowledges that it did take time to make referrals for these evaluations. However, these delays were not so offensive as to warrant a finding that no reasonable efforts were made. Mother was receiving mental health services weekly along with medication management. She was attending visits and working with the foster mother to learn more about her child's medical needs. Throughout the history of the case, Mother has acknowledged that she needs help in parenting her child. None of the other family placements were appropriate.

1925(a) Op. at 6-7.

- 10 -

The trial court's conclusion that CYF made reasonable efforts is supported by the record. Further, the trial court did not abuse its discretion in finding that CYF provided reasonable efforts to Mother or in finding that CYF was permitted to take time to determine which services would best assist Mother. The trial court reasoned that Mother's medical records provided contradictory information, Mother was receiving assistance through various services, and Mother was allowed visits with Child.

Mother next contends there was no clear necessity that justified removal of Child from Mother's care. She argues that Dr. Rector testified that Mother was compliant with her treatment and "psychiatrically stable with caveats." Mother's Br. at 24. Mother asserts the trial court erred in not crediting Dr. Rector's testimony that Mother and Child had a bond, arguing that although Dr. Rector spent only an hour with Mother and Child, there was no testimony as to how long Dr. Pepe spent with Mother. She argues the trial court misapprehended Dr. Rector's testimony, noting Dr. Rector made it clear she was providing an expert opinion that there was no psychiatric reason Mother could not care for Child, and that she was not providing an expert opinion as to bonding. Mother further argues that the trial court did not explain why CYF should not have provided crisis in-home services.

As discussed above, the trial court did not err in finding CYF made reasonable efforts to assist Mother. Mother, in effect, is asking this Court to grant greater weight to the testimony of Dr. Rector than did the trial court.

However, we are bound by the trial court's credibility determinations, which are supported by the record, and we cannot reweigh the evidence. *See In re R.J.T.*, 9 A.3d at 1190.

Mother's final claim is that the trial court erred because it allowed the matter to be delayed without consideration of Mother's right of care and control of Child. Mother's Br. at 27. She argues the case should have proceeded on January 13, 2016, because Mother was prepared to proceed and to present Dr. Rector's testimony.[2] *Id.* She further argues that the case should have proceeded on February 4, 2016 as to Mother and that the trial court should not have stopped the February 26, 2016 proceedings at 5:00 p.m., but rather should have continued to hear testimony. *Id.* at 28.

This Court reviews the trial court's order granting a continuance for an abuse of discretion. *In re J.K.*, 825 A.2d 1277, 1280 (Pa.Super. 2003). "An abuse of discretion is more than just an error in judgment and, on appeal, the trial court will not be found to have abused its discretion unless the record discloses that the judgment exercised was manifestly unreasonable, or the results of partiality, prejudice, bias, or ill-will." *Id.*

---

[2] Mother did not object to the emergency removal or to the December 16, 2015 order granting a continuance.

- 12 -

(quoting ***Corrado v. Thomas Jefferson Univ. Hosp.***, 790 A.2d 1022, 1035 (Pa.Super. 2001)).[3]

The trial court found:

> Any delays in the proceedings were not violative of Mother's Due Process rights. This Court took into account the prejudice to all parties and the risks of keeping the child in foster care. Father also suffered from mental health issues and requiring him to proceed at an Adjudicatory Hearing without counsel would have been egregious. Mother suffered no prejudice from the delay. Placing the child in foster care was necessary as Mother was not able to care for the child and no family members followed procedure to become a placement option.

1925(a) Op. at 7. This was not an abuse of discretion. The trial court considered the interests of Child, Mother, and Father in granting the continuance and further noted that additional evidence was required, particularly as to Mother's ability to care for Child.

Order affirmed.

---

[3] Pennsylvania Juvenile Court Rule 1122 provides: "In the interests of justice, the court may grant a continuance on its own motion or the motion of any party. On the record, the court shall identify the moving party and state its reasons for granting or denying the continuance." Further, the Pennsylvania Juvenile Act provides in part: "On its motion or that of a party the court may continue the hearings under this section for a reasonable period, within the time limitations imposed by this section, to receive reports and other evidence bearing on the disposition or the need for treatment, supervision or rehabilitation." 42 Pa.C.S. § 6341(e).

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: <u>12/15/2016</u>