J-A24018-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| FRED DIMEO AND NANCY DIMEO | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| PETER GROSS, D.O., G.S. PETER | : | |
| GROSS, D.O., P.C., PENNSYLVANIA | : | |
| HOSPITAL OF THE UNIVERSITY OF | : | No. 280 EDA 2024 |
| PA HEALTH SYSTEM, UNIVERSITY OF | : | |
| PENNSYLVANIA HEALTH SYSTEM, | : | |
| TRUSTEES OF THE UNIVERSITY OF | : | |
| PENNSYLVANIA | : | |
| | : | |
| | : | |
| APPEAL OF: PETER GROSS, D.O. | : | |
| AND G.S. PETER GROSS, D.O., P.C. | : | |

Appeal from the Judgment Entered November 27, 2023
In the Court of Common Pleas of Philadelphia County Civil Division at
No(s):  191003447

MEMORANDUM PER CURIAM: **FILED APRIL 2, 2025**

Appellants, Peter Gross, D.O. and G.S. Peter Gross, D.O., P.C., appeal from the judgment entered in the Philadelphia County Court of Common Pleas, in favor of Appellees, Fred and Nancy DiMeo.  We affirm.

The relevant facts and procedural history of this appeal are as follows. Dr. Gross operates a family medicine practice in Philadelphia.  Mr. DiMeo was Dr. Gross's patient.  On September 17, 2018, Mr. DiMeo called the doctor's office to complain about intermittent chest pain and gas.  Mr. DiMeo requested an appointment with the doctor for later that day, but a receptionist advised Mr. DiMeo that Dr. Gross did not have an appointment available.  (**See** N.T.

Trial, 9/25/23 (after lunch), at 112). At some point during the phone call, Dr. Gross's staffer advised Mr. DiMeo take Tums for gas relief. (**Id.** at 116). After the phone call, Mr. DiMeo's symptoms persisted through the night.

On September 18, 2018, Mr. DiMeo called Dr. Gross's office to complain about the same symptoms. Again, the doctor's office did not have any appointments available. Mr. DiMeo decided to request a prescription for an electrocardiogram. Dr. Gross's office provided Mr. DiMeo with a prescription for an electrocardiogram, as well as a chest x-ray. That morning, Mr. DiMeo retrieved the prescription and went to Pennsylvania Hospital for testing. The hospital completed the tests in less than an hour, and Mr. DiMeo returned home. Later that evening, Mr. DiMeo's chest pain continued. At approximately 10:23 p.m., Mr. DiMeo's son took him to the emergency room at Kennedy Memorial Hospital in Stratford, New Jersey. The emergency room doctor diagnosed Mr. DiMeo with a myocardial infarction. The next day, Mr. DiMeo was transferred to Cooper University Hospital for cardiac catheterization.

The trial court opinion set forth the remaining procedural history of this appeal as follows:

> Appellee[1] commenced this action on October 29, 2019 by way of filing a complaint against the Appellants, University of Pennsylvania Hospital, University of Pennsylvania Health System, and the Trustees of the University of Pennsylvania

---

[1] The trial court opinion collectively refers to Mr. and Mrs. DiMeo as "Appellee." (**See** Trial Court Opinion, filed 2/13/24, at 1).

("Hospital Defendants"). Dr. Gross filed his answer with new matter on January 15, 2020, the Hospital Defendants filing their answer with new matter two days prior. Appellee filed replies to the new matters on January 29, 2020. Gross Practice filed its answer with new matter on May 11, 2020. Appellee filed its reply the following day and the pleadings closed on May 12, 2020. Discovery ensued for the next couple of years and **on March 23, 2022, the parties were made aware that trial of this matter would commence on September 25, 2023.**

Prior to trial commencing, Appellee settled with the Hospital Defendants and the trial would proceed against Appellants. On September 19, 2023, two days prior to jury selection and six days prior to trial, Appellants' counsel requested that trial begin on September 26 due to his client observing Yom Kippur, which fell on September 25. That same day, Appellee's counsel objected to Appellants' request because expert witnesses … shifted their professional responsibilities in order to be available for trial starting September 25, 2023. Appellee's counsel further pointed out that Appellants knew of the trial start date since March of 2022 and at no prior time did Appellants' counsel file any conflict letters or requests to postpone the trial due to the holiday until their September 19, 2023 request. The following day the court informed the parties that trial would commence as scheduled. The day prior to jury selection Appellee and the Hospital Defendants reached a settlement and the trial proceeded against Appellants.

Trial began on September 25, 2023 and would end on September 28, 2023. [Dr. Gross did not attend the first day of trial, but he attended trial on each of the remaining days.]

\* \* \*

On the last day of trial, after closing arguments and jury instructions, the jury deliberated and reached a verdict in the amount of $3,500,000 in favor of Appellee and against Appellants. The jury was polled, and the verdict was unanimous as all twelve jurors agreed with the verdict. Then, as agreed upon between counsel, the jury verdict was then molded as if the jury found against both Dr. Gross and the Gross Practice.

- 3 -

On October 2, 2023, Appellee filed a Motion for Delay Damages. Four days later, on October 6, 2023, Appellants filed a timely Post-Trial Motion. Then on October 16, 2023, Appellee filed a Post-Trial Motion. The trial court granted Appellee's Motion for Delay Damages via the trial court's November 1, 2023 Order, increasing the jury verdict to $4,048,641.63. The trial court granted Appellee's Post-Trial Motion via the trial court's November 22, 2023 Order, per the agreement reached at trial between counsel, molding the verdict to reflect the final [Medicare] lien amount of $61,367.97. The trial court then denied Appellants' Post-Trial Motion and entered judgment in favor of Appellee and against Appellants via the trial court's November 27, 2023 Order. On December 18, 2023, Appellants timely filed a Notice of Appeal and three days later, on December 21, 2023, Appellants filed a Motion for *Supersedeas*, [to] which Appellee filed a response/cross-motion, and the trial court denied Appellants' Motion for *Supersedeas* and granted Appellants' cross-motion….

(Trial Court Opinion at 1-3) (record citations omitted) (emphasis added). On January 3, 2024, the court ordered Appellants to file a Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. Appellants timely filed their Rule 1925(b) statement on January 24, 2024.

Appellants now raise three issues for this Court's review:

Did the trial court abuse its discretion by prioritizing docketing concerns over Dr. Gross's request to delay the start of his trial by **one day** or to make other accommodations so that Dr. Gross could both observe the most solemn holy day in Judaism and attend the trial against him, thus forcing Dr. Gross to choose between his fundamental due process right to attend trial and his right to free exercise of religion under both the federal and Pennsylvania constitutions?

Did the trial court err by increasing the judgment to reflect the amount of the Medicare lien instead of satisfying the lien with a portion of the judgment?

- 4 -

Did the trial court err or abuse its discretion by not ordering a new trial on damages or remitting the damages for past and future non-economic damages where: (a) the verdict form failed to comply with applicable law; (b) the jury's award of damages was excessive based on the evidence; and (c) the trial court failed to consider § 515 of the MCARE Act or even provide an explanation for why remittitur was not warranted, as required by that provision?

(Appellants' Brief at 4-5) (emphasis in original).

In their first issue, Appellants contend that the decision to deny a continuance is "unreasonable when the court views docket control and scheduling concerns as ends in themselves, rigidly forcing cases through the pipeline despite litigants' reasonable requests for accommodation." (*Id.* at 19) (citing ***Budget Laundry Co. v. Munter***, 450 Pa. 13, 16-23, 298 A.2d 55, 56-59 (1972); ***Krull v. Krull***, 344 A.2d 619, 620 (Pa.Super. 1975)). Appellants maintain that the court unreasonably denied their request for a one-day postponement of trial to accommodate Dr. Gross's observance of Yom Kippur. Appellants insist that the court demonstrated an "assembly line approach to justice" because it did not make "even a cursory effort to explore alternatives, including either a longer continuance to a time when all concerned would be available or the use of advanced communication technology." (*Id.* at 22). Appellants emphasize that Dr. Gross possessed a "religious obligation to observe Yom Kippur," and the court abused its discretion by forcing the doctor to choose between attending trial and a

religious observance.[2]  (*Id.* at 25).

Appellants also raise the constitutional argument that the court's failure to grant a continuance violated Dr. Gross's First Amendment right to the free exercise of his religion.  Appellants posit that the court's failure to accommodate Dr. Gross's religious observance is subject to strict scrutiny, because the court forced Dr. Gross "to abandon one constitutional right in favor of the other[.]"  (*Id.* at 38).  Appellants assert the court's decision cannot survive a strict scrutiny analysis, and the United States Supreme Court has repeatedly held that a governmental action substantially burdens religious exercise "when it presents an individual with a Hobson's choice between receipt of an important benefit and the exercise of one's religious faith."  (*Id.* at 39-40).  Appellants continue, "[s]uch a 'choice' between two fundamental rights is no choice at all, and forcing Dr. Gross to choose between them substantially burdened his right to free exercise."  (*Id.* at 44-45).  Moreover, Appellants submit that the court violated Dr. Gross's rights to religious freedom and the enjoyment of his civil rights under the Pennsylvania Constitution.

> Because the trial court's failure to grant Dr. Gross a brief continuance violated his fundamental rights under the United States and Pennsylvania Constitutions, the court's error tainted the entire trial and is not subject to harmless

---

[2] Appellants claim that "courts across the country have recognized that it is an abuse of discretion to force parties into choosing between attending trial and their religious observances." (Appellants' Brief at 25).  Appellants proceed to analyze cases from Maryland and Ohio.  We will address these cases *infra*.

error review.

(**Id.** at 64). Appellants conclude that they are entitled to a new trial on these grounds. We disagree.

Preliminarily, we note that the parties' briefs direct our attention to the various tests employed by the United States Supreme Court upon claims of violations of the Free Exercise Clause of the First Amendment. Nevertheless, we believe that the issue presented here, *i.e.*, the propriety of the denial of a request for the continuance of a civil trial, can be resolved without reaching the constitutional question. **See Renner v. Court of Common Pleas of Lehigh County**, 660 Pa. 255, 264 n.6, 234 A.3d 411, 417 n.6 (2020) (stating, "when a case raises both constitutional and non-constitutional issues, a court should not reach the constitutional issue if the case can properly be decided on non-constitutional grounds"). Thus, we proceed to analyze the relevant case law governing continuance requests in the trial courts of this Commonwealth.

"A trial court is vested with broad discretion in determining whether a request for a continuance should be granted, and an appellate court should not disturb its decision unless an abuse of that discretion is shown." **Zappacosta v. McAvoy**, 325 A.3d 782, 786 (Pa.Super. 2024).

> An abuse of discretion is more than just an error in judgment and, on appeal, the trial court will not be found to have abused its discretion unless the record discloses that the judgment exercised was manifestly unreasonable, or the results of partiality, prejudice, bias or ill-will.

***Corrado v. Thomas Jefferson University Hosp.***, 790 A.2d 1022, 1035 (Pa.Super. 2001).

The Pennsylvania Rules of Civil Procedure govern continuance requests as follows:

> **Rule 216.  Grounds for Continuance**
>
> **(a)**   The following are grounds for a continuance:
>
> \*    \*    \*
>
> (4)   Such special ground as may be allowed in the discretion of the court;
>
> \*    \*    \*
>
> **(c)**   No application for a continuance shall be granted if based on a cause existing and known at the time of publication or prior call of the trial list unless the same is presented to the court at a time fixed by the court, which shall be at least one week before the first day of the trial period.  Applications for continuances shall be made to the court, or filed in writing with the officer in charge of the trial list, after giving notice of such application by mail, or otherwise, to all parties or their attorneys.  Each court may, by local rule, designate the time of publication of the trial list for the purposes of this rule.

Pa.R.C.P. 216(a)(4), (c).[3]  "While certain exceptions exist to the general rule, whereby the court may in its sound discretion grant a request for a

---

[3] In their brief, Appellees question the applicability of Rule 216 in light of the protocols for scheduling trials set forth in Philadelphia's local rules of civil procedure:

> This was not a case in which the parties first learned the case would be scheduled for trial when the case appeared

*(Footnote Continued Next Page)*

continuance due to the absence of a party or witness, the court may still demand a **showing of diligence** on the part of the movant before so granting." ***Baysmore v. Brownstein***, 771 A.2d 54, 57-58 (Pa.Super. 2001) (emphasis added). ***See also Geiger v. Rouse***, 715 A.2d 454, 457 (Pa.Super. 1998) (holding trial court did not abuse discretion in denying appellants' continuance motion; appellants waited until first day of trial to move for continuance, despite receiving notice of trial date approximately one month earlier; it could reasonably be assumed that appellants were aware of need for continuance when they first received notice of trial date).

Instantly, on the first day of trial, the court and parties discussed the circumstances surrounding Appellants' continuance request:

> THE COURT: Now, I just want to put on the record there was a pretrial conference with Judge Schulman last week

---

> on a published trial list or was announced on the call of the list as among the cases to be tried during the upcoming trial term (the predicate for subsection (c) to apply). Here, the parties had been given a date certain for trial eighteen months earlier pursuant to [Philadelphia Local Rule of Civil Procedure] *215(A)(2), which provides, in relevant part: "Protracted and complex cases will be listed for dates certain." Since the initial premise of subpart (c) was not met—that notice the case was being called to trial was given through "publication or prior call of the trial list"—the remainder of subpart (c) is inapplicable on its face.

(Appellees' Brief at 40). Although Appellees suggest that the local rule controls and Rule 216 is inapplicable here, we read Rule 216 in conjunction with the local rule regarding the listing of complex cases.

before jury selection.[4]

\* \* \*

So the issue about when to start this case did come up before Judge Schulman. I didn't know when an email was sent to myself and my staff from defense counsel requesting that this case not start today because the defendant is celebrating the Jewish holiday today.

[APPELLANTS' COUNSEL]: It's a holy day, Your Honor. I'm told it's a holy day.

THE COURT: Holy day. Okay. Let me be correct with the right terminology.

So I've gotten the response, then, from [Appellees'] counsel indicating that this was already addressed and for the first time before Judge Schulman.

So of course the next thing that I did was I contacted Judge Schulman to see what was represented and what was not.

And Judge Schulman had said that the case will start on Monday, meaning today. If [Appellees'] expert cannot testify on Tuesday, because the expert was already arranged to fly in on Sunday to testify on Monday and would not be available to testify on Tuesday.

If the expert was, then we could start on Tuesday. So the expert was not. So that is why we are starting today.[5]

---

[4] The certified record on appeal does not include a transcript from the pretrial conference. According to Appellants, the conference and continuance request occurred on September 18, 2023. (**See** Appellants' Brief at 7). Appellees and the trial court, however, indicate that the continuance request occurred on September 19, 2023. (**See** Appellees' Brief at 20; Trial Court Opinion at 7).

[5] Appellants attack this conclusion claiming that Appellees' expert "testified that he routinely blocks off **two days** to testify at trial, meaning that if he arrived in Philadelphia on Sunday, he would be available for court on both Monday and Tuesday[.]" (Appellants' Brief at 23) (record citation omitted) *(Footnote Continued Next Page)*

- 10 -

And I have given, obviously, [Dr. Gross] the option of being present or not being present in the courtroom today because of the holy day.

(N.T. Trial, 9/25/23 (before lunch), at 6-8).

In evaluating these circumstances, the court concluded that it

did not abuse its discretion in denying Appellants' continuance request because with Appellants knowing the trial was to begin on September 25, 2023 (Yom Kippur) since March 23, 2022, the continuance request was made based on cause previously existing or known. Counsel for Appellee made his objection known to the trial court on September 19, 2023, stating that if the trial were postponed it would interfere with Appellee's expert witnesses who shifted their professional responsibilities to appear at trial on September 25, 2023.

\*     \*     \*

Furthermore, Appellants failing to make a continuance request or submitting a conflict letter with the court at any point in time after March 23, 2022, shows a lack of diligence on behalf of Appellants.

(Trial Court Opinion at 7-8).[6]

_____

(emphasis in original). We reviewed the expert's testimony, and he stated, "I take two days off to be able to do this." (N.T. Trial, 9/25/23 (before lunch), at 100). The expert, however, did not elaborate on the specific days he took off for this case. On this vague record, it is possible that the expert actually "blocked off" Sunday and Monday, with the need for travel on both days.

[6] The trial judge also invoked the coordinate jurisdiction rule and claimed that she could not have overridden Judge Schulman's decision from the pretrial conference. (**See** Trial Court Opinion at 8). Because this court may affirm the decision on any ground, however, we focus our analysis on the conclusion that Appellants failed to demonstrate diligence in moving for the continuance. **See Shamis v. Moon**, 81 A.3d 962, 970 (Pa.Super. 2013) (noting Superior Court has ability to affirm decision on any grounds supported by record).

- 11 -

We agree with the court's conclusion that Appellants failed to act with diligence in requesting a continuance. **See Baysmore, supra**. On March 21, 2022, the court listed the matter for a five-day trial with a date certain of Monday, September 25, 2023, and jury selection commencing on Thursday, September 21, 2023. (**See** Notice of Trial Attachment, filed 3/21/23). The docket indicates that the notice of the trial date was given to the parties on March 23, 2022. Despite having the trial date more than eighteen (18) months in advance, Appellants waited until the week before trial to seek a continuance due to an annual Jewish holy day. We cannot say that Appellants demonstrated diligence where they waited so long to seek this continuance. **See Baysmore, supra** (explaining trial was scheduled for November 8, 1999; notice of trial date was sent to parties on September 2, 1999; appellant's counsel first requested continuance on October 27, 1999; request for continuance was based on appellant's prepaid vacation, which was scheduled well before continuance request; no showing of diligence on appellant's part).

We recognize that Appellants cite cases from other jurisdictions holding that trial courts erred by failing to grant continuances for religious holy days.[7] We believe these cases are factually distinguishable from the instant case. **See Neustadter v. Holy Cross Hosp. of Silver Spring, Inc.**, 418 Md. 231,

---

[7] "The decisions of federal courts, as well as those from other states, are not binding authority upon this Court, but we may consider them as persuasive authority." **Adams o/b/o T.E.A. v. Adams**, 326 A.3d 107, 112 n.4 (Pa.Super. 2024).

13 A.3d 1227 (2011) (holding trial court abused its discretion in denying continuance; at hearing conducted on January 24, 2008, court scheduled trial for June 2, 2008; between January and May 2008, parties' attorneys communicated about scheduling conflict due to Orthodox Jewish petitioner's observance of Shavuot, which would fall on fifth and sixth days of ten-day trial; petitioner's attorney first requested continuance on May 6, 2008, almost one month prior to trial; continuance motion noted that attorney, as petitioner's agent, was prohibited from working on petitioner's behalf during Shavuot; denying continuance and moving forward with trial in absence of petitioner and petitioner's attorney was presumptively prejudicial); *Fifth Third Bank of Columbus v. Margolis Family Ltd. Partnership*, 1997 WL 770966 (Ohio App. Dec. 9, 1997) (holding trial court abused its discretion in denying continuance request; trial was scheduled for April 22, 1997; defendants filed continuance motion on March 24, 1997, almost one month prior to trial; continuance motion noted that trial fell on first full day of Passover; circumstances of case failed to suggest any significant inconvenience to plaintiff due to defendants' continuance request).

In examining cases from other jurisdictions, we are mindful of the following analysis from the Superior Court of New Jersey, Appellate Division:

> The coming of a holy day is known to an observant member of the faith involved. Whether an observant member will attend to business affairs on that day is purely a personal decision. Reasonable advance planning is expected to be made by the religious observant for the managing of secular matters which might arise on a religious day.

* * *

> There is nothing unique, unusual, unexpected, or surprising about the annual occurrence of Yom Kippur. The date is predictable and within the knowledge of a devout observant. Plaintiff was not confronted by or beset with a wholly unexpected event which would excuse his lack of diligence.

*Epstein v. State*, 709 A.2d 1353, 1356-57 (N.J.Super.App.Div. 1998), *certification denied*, 155 N.J. 589 (1998) (holding Yom Kippur was not "extraordinary circumstance" that would excuse compliance with statutory deadline for notice of tort action). We consider the reasoning in *Epstein* persuasive. *See Adams, supra*.

In closing, our decision should **not** be interpreted as foreclosing continuance requests based upon religious observances. Rather, we simply mean to amplify the notion that courts may demand a showing of diligence on the part of the movant before granting such requests. Here, Appellants knew about their trial date over a year in advance. A quick calendar search would have revealed the trial's conflict with Yom Kippur, and Appellants could have moved for a continuance weeks or months in advance. Appellants, however, waited until the eleventh hour, after the scheduling of expert witnesses, to request a continuance. Under these circumstances, Appellants failed to act with diligence, and we cannot say that the court abused its discretion in

denying the request.[8]  **See Zappacosta, supra**; **Corrado, supra**.

In their second issue, Appellants assert that the court incorrectly molded the verdict by adding the amount of a Medicare lien to the judgment in favor of Appellees.

> [A]t no point did the parties stipulate to the amount of the judgment being **increased** to cover this lien.  Rather, they simply agreed that the judgment would be molded to **reflect** Medicare's lien against it.  In reaching this agreement, Dr. Gross intended only that a portion of the verdict already awarded by the jury would be paid over to Medicare.

---

[8] On February 13, 2025, Appellants filed an application for post-submission communication, asking this Court to take judicial notice of the Philadelphia County Court of Common Pleas' closure due to the Philadelphia Eagles' Super Bowl victory parade.  Appellants added that

> the Philadelphia Court of Common Pleas, on occasion, treats religious observance less favorably than secular events when deciding whether to postpone judicial proceedings. Indeed, as *amici* observed, Philadelphia courts also closed on less than seven days' notice when the Eagles won the Super Bowl in 2018.  If an entire court's calendar can be changed on short notice to celebrate a football win, notwithstanding the schedules of expert witnesses and other participants, the schedule in an individual case can certainly be changed on short notice to accommodate a litigant's religious observance.

(Application for Post-Submission Communication, filed 2/13/25, at 1-2).

While we acknowledge Appellants' attempt to utilize this recent event to buttress the argument in their brief, we believe Appellants have drawn a false equivalency.  The considerations surrounding a trial jurist's ruling on a litigant's continuance motion differ sharply from the considerations surrounding a court administrator's evaluation of the feasibility of court operations on the day of a major civic event.

(Appellants' Brief at 68) (record citations omitted) (emphasis in original).

Appellants also claim that there is no authority requiring a Medicare lien to be added to the amount of the judgment if the parties did not present evidence about the amount of the lien or any special damages. Appellants conclude that this Court must reverse the ruling that increased the amount of the judgment. We disagree.

"It is well settled that a trial court in this Commonwealth has the power to mold a jury's verdict to conform to the clear intent of the jury." *Carlini v. Glenn O. Hawbaker, Inc.*, 219 A.3d 629, 639 (Pa.Super. 2019) (quoting *Mendralla v. Weaver Corp.*, 703 A.2d 480, 485 (Pa.Super. 1997) (*en banc*)).

> The power of a trial judge to exercise [his or her] discretion in molding a verdict to fit the expressed desires of the jury is a cornerstone of the jury system. Moreover, verdicts which are not technically correct in form but which manifest a clear intent on the part of the jury may be corrected without resort to further jury deliberations or the grant of a new trial.

*Id.* (quoting *Mirizio v. Joseph*, 4 A.3d 1073, 1088 (Pa.Super. 2010)).

Instantly, on the first day of trial, counsel explained the circumstances surrounding the Medicare lien:

> [APPELLEES' COUNSEL]: There is something that I would like to put on the record just in terms of an agreement between counsel.
>
> THE COURT: Okay.
>
> [APPELLEES' COUNSEL]: If I can have one second with [Appellants' counsel] just to confirm?

THE COURT:   Sure.

(Brief pause.)

[APPELLEES' COUNSEL]:   Thank you, Your Honor.

So … there is a medical lien being asserted by Medicare. Right now, the lien is approximately $88,000.

There is an agreement among counsel that should there be a verdict awarded in favor of [Appellees] against Dr. Gross, we are going to mold the verdict to whatever the final lien amount comes out to be.

There are some charges that Medicare won't negotiate with me until they know the final result.   But there are some charges that I think should be removed.

And then I'm also going to request Medicare to give a reduction for us protecting that lien.   So whatever the reduction amount is and any charges that I can get removed, which are in the best interest of Dr. Gross and my clients, that will be the amount that we will ask to mold any verdict for repayment of past medical expenses.

THE COURT:   Okay.

[APPELLANTS' COUNSEL]:      I don't have a problem with that.

My problem, Your Honor, is that we don't know what that number is going to be yet, so I'm not quite sure how we're going to mold the verdict.   We can't give—we can't say the verdict is molded to "X" when we don't have the actual number.

[APPELLEES' COUNSEL]:   If there's a verdict, then I can go back to Medicare and I can get the number.   And once we have the final letter from Medicare with the final number and any reduction, that's what we're going to ask to mold it to.

[APPELLANTS' COUNSEL]:      Okay.   I'm just saying it's

not going to be a specific number the day we get a verdict. That's what I'm trying to point out here.

[APPELLEES' COUNSEL]:   That's correct.

THE COURT:   It would have to be a post-trial motion.

[APPELLEES' COUNSEL]: Yeah.   We'll have to file it afterwards.

THE COURT:   Right. Yeah. Okay?  Do you agree with that?

[APPELLANTS' COUNSEL]:      I do agree with that.  Yes, Your Honor.

(N.T. Trial, 9/25/23 (before lunch), at 12-14).

Following trial, the jury found that Dr. Gross was negligent, Dr. Gross's negligence caused Appellees' harm, and one hundred percent of the causal negligence was attributable to Dr. Gross.  (*See* Verdict Slip, filed 10/3/23). Consequently, Appellees filed a post-trial motion asking the court to "allow the verdict to be molded to reflect the final lien amount asserted by Medicare as per the 25 September 2023 agreement on-the-record among counsel."[9] (Appellees' Post-Trial Motion, filed 10/16/23, at ¶6).   By order entered November 22, 2023, the court granted Appellees' post-trial motion and molded the verdict to reflect the final lien amount of $61,367.97.

_____

[9] Appellees' post-trial motion noted that Medicare had asserted a lien for $88,957.97.  Appellees' counsel disputed that figure by sending a letter to Medicare on October 5, 2023, which sought the removal of three unrecoverable charges totaling $16,738.22.   On November 20, 2023, Appellees' counsel informed the court that he had received a response from Medicare, and the final lien amount was $61,367.97.

In evaluating Appellants' challenge to the propriety of the order molding the verdict, the court observed that it

> did not abuse its discretion [or] err in increasing the verdict by the lien since such was agreed to at trial by the attorneys. Furthermore, the trial court molding the verdict as to the lien amount did not go against the jury's intent as the verdict was still in favor of Appellee and against Appellants.

(Trial Court Opinion at 36). We agree. Contrary to Appellants' argument on appeal, the on-the-record discussion between the court and trial counsel evinces an agreement to mold any verdict to include the repayment of Mr. DiMeo's past Medicare expenses. The decision to mold the verdict also fit the expressed intent of the jury, which found Dr. Gross liable for Mr. DiMeo's damages. *See Carlini, supra*. On this record, the court did not abuse its discretion in granting Appellees' post-trial motion, and Appellants are not entitled to relief on their second claim. *Id.*

In their final issue, Appellants attack the jury's award of damages on multiple grounds. First, Appellants submit that the verdict slip improperly broke down the amounts of past and future non-economic damages into additional categories. Specifically, the verdict slip "contained separate lines for 'pain and suffering' and 'loss of ability to enjoy the pleasures of life[.]'" (Appellants' Brief at 70). Citing Section 509(a) of the Medical Care Availability and Reduction of Error ("MCARE") Act, Appellants claim that all past non-economic damages must be awarded in a lump sum, and all future non-economic damages must be awarded in a lump sum. Thus, Appellants

complain that the court erred by dividing the damages into separate categories on the verdict slip.

Next, Appellants assert that the damages award was excessive when compared to the evidence adduced at trial. Appellants emphasize that Appellees' expert, Dr. Hayek, testified that Mr. DiMeo would have suffered a heart attack regardless of the timing of his diagnosis.

> At most, any delay in treatment required only minor procedures (an outpatient cardiac ablation and placement of a defibrillator), and Mr. DiMeo reported that his only limitation was his inability to lift heavy weights.

(**Id.** at 72-73) (record citations omitted). Based upon this evidence, Appellants maintain that the award of $3.5 million in non-economic damages is excessive and shocking.

Finally, Appellants argue that the court erred by failing to consider the impact of the verdict on the availability of health care in the community. Appellants suggest that "the excessive verdict is an unsustainable economic hit to Dr. Gross's practice that could cripple his ability to provide quality medical care in a community that desperately needs it." (**Id.** at 73). Citing Section 515 of the MCARE Act, Appellants aver that a court must consider evidence of the impact upon availability to health care in the community if a defendant health care provider is required to satisfy the verdict rendered by the jury. Appellants contend the court violated Section 515 by failing to consider Appellants' compelling evidence of the verdict's impact on the South Philadelphia community where Dr. Gross's practice is located. Appellants

conclude that the court abused its discretion by failing to order a new trial on damages and denying remittitur. We disagree.

"Our standard of review regarding a trial court's denial of a motion for a new trial is limited: 'The power to grant a new trial lies inherently with the trial court and we will not reverse its decision absent a clear abuse of discretion or an error of law, which controls the outcome of the case.'" **Chavers v. 1605 Valley Center Pky, LP**, 294 A.3d 487, 503 (Pa.Super. 2023) (quoting **Maya v. Johnson and Johnson**, 97 A.3d 1203, 1224 (Pa.Super. 2014)). "[T]he decision to grant or deny remittitur is within the sole discretion of the trial court, and proper appellate review dictates this Court reverse such an Order only if the trial court abused its discretion or committed an error of law in evaluating a party's request for remittitur." **Tillery v. Children's Hospital of Philadelphia**, 156 A.3d 1233, 1246 (Pa.Super. 2017), *appeal denied*, 643 Pa. 119, 172 A.3d 592 (2017) (quoting **Renna v. Schadt**, 64 A.3d 658, 671 (Pa.Super. 2013)).

"'The duty of assessing damages is within the province of the jury' and, thus, as a general matter, a compensatory damage award 'should not be interfered with by the court unless it clearly appears that the amount awarded resulted from caprice, prejudice, partiality, corruption or some other improper influence.'" **Paves v. Corson**, 569 Pa. 171, 175, 801 A.2d 546, 548-49 (2002) (quoting **Gradel v. Inouye**, 491 Pa. 534, 547, 421 A.2d 674, 680 (1980)). "This standard incorporates the well-established requirement that a

compensatory damage award 'must bear some reasonable relation to the loss suffered by the plaintiff as demonstrated by uncontroverted evidence at trial.'"

*Id.* at 175, 801 A.2d at 549 (quoting *Neison v. Hines*, 539 Pa. 516, 520, 653 A.2d 634, 637 (1995)).

> This Court will not find a verdict excessive unless it is so grossly excessive as to shock our sense of justice. We begin with the premise that large verdicts are not necessarily excessive verdicts. Each case is unique and dependent on its own special circumstances and a court should apply only those factors which it finds to be relevant in determining whether or not the verdict is excessive.

*Tillery, supra* at 1246 (quoting *Tindall v. Friedman*, 970 A.2d 1159, 1177 (Pa.Super. 2009)). "We cannot merely substitute our judgment for that of the fact-finder, and we must review the record in light of the evidence accepted by the jury." *Smalls v. Pittsburgh-Corning Corp.*, 843 A.2d 410, 414 (Pa.Super. 2004), *appeal denied*, 579 Pa. 704, 857 A.2d 680 (2004) (internal citation and quotation marks omitted).

To the extent Appellants rely on the provisions of the MCARE Act, "statutory interpretation of the MCARE Act presents a question of law, our standard of review is *de novo* and our scope of review is plenary." *Tillery, supra* at 1244. Section 509 provides, in relevant part:

> **§ 1303.509.  Payment of damages**
>
> **(a)     General rule.—**In a medical professional liability action, the trier of fact shall make a determination with separate findings for each claimant specifying the amount of all of the following:
>
> (1)     Except as provided for under section 508, past

damages for:

      (i)      medical and other related expenses in a lump sum;

      (ii)      loss of earnings in a lump sum; and

      (iii)      noneconomic loss in a lump sum.

(2)      Future damages for:

      (i)      medical and other related expenses by year;

      (ii)      loss of earnings or earning capacity in a lump sum; and

      (iii)      noneconomic loss in a lump sum.

40 P.S. § 1303.509(a) (footnote omitted).

Section 515 provides, in relevant part:

**§ 1303.515.  Remittitur**

**(a)      General rule.—**In any case in which a defendant health care provider challenges a verdict on grounds of excessiveness, the trial court shall, in deciding a motion for remittitur, consider evidence of the impact, if any, upon availability or access to health care in the community if the defendant health care provider is required to satisfy the verdict rendered by the jury.

**(b)      Factors and evidence.—**A trial court denying a motion for remittitur shall specifically set forth the factors and evidence it considered with respect to the impact of the verdict upon availability or access to health care in the community.

**(c)      Abuse of discretion.—**An appellate court reviewing a lower court's denial of remittitur may find an abuse of discretion if evidence of the impact of paying the verdict upon availability and access to health care in the community has not been adequately considered by the lower court.

40 P.S. § 1303.515(a)-(c).

Instantly, the verdict slip addressed past and future non-economic damages as follows:

QUESTION NO. 4:

State the amount of damages, if any, sustained by Plaintiff as a result of the negligence of the Defendant(s) you have found negligent.

Past Non-Economic Loss

Pain and Suffering                                            $ 1,250,000

Loss of Ability to Enjoy the Pleasures of Life               $ 1,250,000

Future Non-Economic Loss

Pain and Suffering                                            $ 500,000

Loss of Ability to Enjoy the Pleasures of Life               $ 500,000

(Verdict Slip, filed 10/3/23).

Consistent with Section 509(a) of the MCARE Act, the verdict slip demonstrated that the jury made a determination with separate findings specifying the amount of past and future non-economic damages. Although the verdict slip differentiated between the damages for pain and suffering and loss of ability to enjoy life's pleasures, the verdict slip did not include additional line items for medical expenses or loss of earnings. Thus, there could be no confusion about the "lump sum" of the non-economic losses for Section 509(a) purposes. Under the circumstances of this case, we do not believe that the composition of the verdict slip amounts to reversible error. *See Chavers,*

*supra*. Further, as noted by both the trial court and Appellees, itemized damages are acceptable under Pennsylvania law. *See McManamon v. Washko*, 906 A.2d 1259, 1280-81 (Pa.Super. 2006), *appeal denied*, 591 Pa. 736, 921 A.2d 497 (2007).

Regarding the evidence supporting the award of damages, Appellees presented Dr. Hayek as their expert witness.[10] Dr. Hayek opined to a reasonable degree of medical certainty that "the care provided by Dr. Gross to Mr. DiMeo did deviate from the standard of care." (N.T. Trial, 9/25/23 (after lunch), at 9). Dr. Hayek also opined that "the care provided by Dr. Gross to Mr. DiMeo not only increased the risk of harm to Mr. DiMeo but also was a proximate cause of the damage he took to his heart." (*Id.* at 10). Based upon Mr. DiMeo's complaints about chest pain and gas, Dr. Hayek explained that Dr. Gross should have advised Mr. DiMeo to go to an emergency department on September 17, 2018:

> [A] cardiologist office or a family medicine office or internal medicine office is not equipped to diagnose a heart attack.
>
> So to be evaluated properly and safely for your chest pain, it must be done in an emergency room where they have the ability to put you on a heart monitor, where they have the ability to do multiple electrocardiograms, the ability to run levels of what's called troponin to see if there's damage to your heart and repeat blood tests so that they can diagnose if someone is having an acute coronary syndrome or heart attack. It has to be done there.

---

[10] The court permitted Dr. Hayek to testify "as an expert in the standard of care as to family medicine, internal medicine and as a cardiologist." (N.T. Trial, 9/25/23 (after lunch), at 4).

(*Id.* at 17).

Dr. Hayek evaluated the results of the electrocardiogram performed on Mr. DiMeo at Pennsylvania Hospital on the afternoon of September 18, 2018. The test results prompted the following exchange between Dr. Hayek and Appellees' counsel:

> [APPELLEES' COUNSEL]:   And would it be standard of care, after a patient has an EKG with nonspecific T-wave elevation or abnormality, to be sent to the emergency department?
>
> [DR. HAYEK]:        On its own, no, but in the setting of an EKG that's abnormal with chest pain, absolutely, and particularly, Dr. Gross's standard of practice was that if a patient has an abnormal EKG, for any reason, he sent them to the ER.
>
> So this would have triggered—had this been done in [Dr. Gross's] office, this would have triggered him to send Mr. DiMeo to the emergency room, but he didn't get there until the next day.

(*Id.* at 33).

Dr. Hayek also analyzed the results of the electrocardiograms performed on Mr. DiMeo at Kennedy Memorial Hospital on the evening of September 18, 2018. This testing revealed that Mr. DiMeo's heart suffered permanent damage between the time he left Pennsylvania Hospital and the time he arrived at Kennedy Memorial Hospital. Dr. Hayek observed that Mr. DiMeo had lost blood flow to the left anterior descending artery ("LAD"), which had significant consequences:

> The LAD supplies [blood flow to] the most muscle in your heart.  It supplies the whole front wall, the whole apex or

tip of the heart, the septum that divides the two ventricles from each other.  It supplies the most muscle.

And so when—that's why when it shuts down, you have no flow getting to all of these areas that previously were getting normal blood supply through the coronary.

As recently as when that Penn EKG was done, there certainly was blood flow getting through [Mr. DiMeo's] LAD.  There's no segment changes or Q-waves.  Sometime after he left there and went home, it shut down.

Every minute that goes by that you are not getting blood to your heart muscle, muscle is dying.  That's why we have— you know, commercials and public service announcements [saying] get to the hospital fast if you're having chest pain because … time is muscle.

(*Id.* at 48-49).

Dr. Hayek testified that Mr. DiMeo's "late presentation" to the emergency department resulted in "extensive damage" to Mr. DiMeo's heart. (*Id.* at 53).  Although Dr. Hayek later conceded that nothing could have prevented this heart attack, Dr. Hayek opined that Mr. DiMeo would not have suffered the same level of permanent heart damage if he had been hospitalized beginning on the afternoon of September 18, 2023:

Had he been in the hospital, he would have been on a monitor, he would have had nurses looking after him and asking if he had chest pain.  He would have had EKGs done multiple times….  He would have had troponin levels done in the blood.

When the ST elevation started, that would have been picked up as soon as it started, and he would have been whisked off for emergency [catheterization], and he would have had full salvage because he was in the hospital.  He would not have shown up hours after the deed had already been done.

(*Id.* at 53-54).

Appellees also provided testimony from Mr. DiMeo, who stated that he "was pretty healthy, pretty strong" before the heart attack. (*Id.* at 136). After the heart attack, however, Mr. DiMeo could not lift as much weight at the gym. The heart damage also caused Mr. DiMeo's quality of life to suffer:

> It was a world of difference. I can't do as much as I used to do because my heart function is like only 30 percent.
>
> *     *     *
>
> I used to cut my own lawn, take care of that, and I would do chores as far as sometimes I work on my own cars, stuff like that or, you know, any going up and down steps is a little more difficult…. Even though you do cardio work, it's not the same. Because you're carrying your body around, it's a little bit heavier.

(*Id.* at 138-39). Additionally, the heart damage diminished Mr. DiMeo's ability to care for his wife, who suffers from dementia. (*See id.* at 139).

In evaluating this evidence, the court determined that the verdict was not so grossly excessive as to shock one's sense of justice:

> The verdict was not against the weight of the evidence because the jury heard expert testimony as to the applicable standard of care, Dr. Gross's deviation from the standard of care, and that such deviation was the proximate cause of Appellee Fred DiMeo's harm. Dr. Hayek's expert testimony, which detailed Appellee suffer[ing] injuries as a proximate result of Dr. Gross deviating from the applicable standard of care, and Appellee Fred DiMeo's testimony as to what happened and how it affected his life, supported such a verdict.

(Trial Court Opinion at 26). On this record, and mindful of our standard of review and the relevant case law, we decline Appellants' invitation to interfere

with the jury's award of damages.  ***See Paves, supra***; ***Tillery, supra***.

Finally, Appellants' post-trial motion argued for remittitur:

> Here, Dr. Gross is a private family practitioner with thousands of patients.  He cares for many in the South Philadelphia community, including performing house calls for infirm patients who cannot easily access health care.  Such an excessive verdict will clearly impact his continued ability to provide care to the community he has served for more than forty years.

(Appellants' Post-Trial Motion, filed 10/6/23, at ¶113).

In response, Appellees disagreed with Appellants' position:

> [I]t should be noted that Defendant Gross is one of **many** practitioners within the South Philadelphia community and [the trial c]ourt may appropriately conclude this verdict will not negatively impact the availability or access to health care.

(Appellees' Brief in Opposition to Appellants' Post-Trial Motion, filed 10/30/23,

at 23) (emphasis in original).

The court considered these arguments and sided with Appellees:

> As to the MCARE Act requirements, the trial court considered exactly what Appellee points out in his argument.  Dr. Gross is just one of many health/medical practitioners in Philadelphia and specifically South Philadelphia, and the jury verdict in this case does not impact the availability or access to health services in Philadelphia.

(Trial Court Opinion at 34).

Section 515 of the MCARE Act required the court to consider evidence

of the impact upon the availability or access to health care in the community.

We do not fault the court for considering the evidence and accepting Appellees'

argument. Based upon the foregoing, the court did not err by failing to order a new trial on damages or denying remittitur. ***See Paves, supra***; ***Tillery, supra***. Accordingly, Appellants are not entitled to relief on their third issue, and we affirm the judgment entered in favor of Appellees.

Judgment affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 4/2/2025